Inger WINSOR, Plaintiff–Appellant,

v.

HINCKLEY DODGE, INC., a corporation, Defendant–Appellee.

No. 95–4026.

United States Court of Appeals, Tenth Circuit.

March 26, 1996.

Stephen F. Hutchinson of Taylor, Ennenga, Adams & Lowe, Salt Lake City, Utah, for Plaintiff–Appellant.

Gary R. Howe, Steven E. Tyler and John B. Lindsay of Callister Nebeker & McCullough, Salt Lake City, Utah, for Defendant–Appellee.

Before PORFILIO, KELLY, and LUCERO, Circuit Judges.

LUCERO, Circuit Judge.

Plaintiff Inger Winsor appeals the district court's judgment on her sexual harassment claim, brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e–17.* Although we conclude that plaintiff was subjected to sexual harassment which created a hostile work environ-

ment, we affirm the judgment because the district court did not clearly err in finding that plaintiff was not constructively discharged.

## I.

The uncontradicted evidence shows that plaintiff began working for Hinckley Dodge as a salesperson in March 1988. At that time, she was the only woman in the sales force. Plaintiff was successful in her position, and soon became one of the top salespersons.

From the beginning of her employment, plaintiff experienced difficulties with her co-workers. During the first week, a dispute arose about apportionment of a sales commission between plaintiff and a fellow salesman. As a result, the salesman pushed plaintiff against a wall, placed his knee between her legs, and stated "if you ever, you f'ing bitch, talk to my clients again I'll fix you." Although plaintiff reported this incident to the sales manager, the salesman was not disciplined.

Plaintiff testified that throughout 1988, she was called various names including "floor whore" and "curb whore" by her coworkers. Although the manager told several salesmen that such language was inappropriate, they treated it as a laughing matter, and the name-calling continued throughout plaintiff's employment at the dealership. Another employee testified that the salesmen would regularly call plaintiff a "curb side cunt" and "floor whore" behind her back, and would state that "its not who you know but who you blow" in reference to plaintiff. A third employee testified that the other salespeople commonly called plaintiff a "bitch." There was also evidence that, in the early months, the other men made comments to plaintiff that a woman had no place in a car dealership, and that at a sales meeting, the president of the dealership asked the salesmen "you're not going to let a woman beat you in sales, are you?"

---

* The case is unanimously ordered submitted without oral argument pursuant to the applicable rules.

Beginning at the end of 1988, plaintiff's desk was invaded frequently, its contents dumped on the floor, and her awards thrown in the trash. In 1989, plaintiff began receiving notes and pictures, including pictures of gorillas and pigs with the words "bitch," "whore," and "floor whore," written on them, and a cartoon of a woman pulling up her skirt and spreading her legs. Plaintiff testified that she received more than a dozen pictures or notes in 1989 and 1990.

Plaintiff was also subjected to physical mistreatment by her coworkers. In mid-1988, she and a salesman had a dispute in front of a customer in which the salesman pushed her and yelled profanities. The salesman was fired for this behavior. Also in 1988, the salesmen blocked the doors on several occasions, preventing plaintiff's access to customers. In 1989, plaintiff's arms were slammed repeatedly in a door by a salesman, and later that year, her soft drink was spiked with Everclear, resulting in a hospital visit. In early 1990, an automobile hood was slammed on plaintiff's fingers.

Finally, beginning in 1990, there were consistent rumors that plaintiff was having an affair with the sales manager, that the only way she could sell cars was by sleeping with the management, and that plaintiff sold cars by pulling up her skirt. The rumors circulated throughout the dealership, and were reported to customers as well.

In November 1990, the sales manager was terminated for theft. Although plaintiff applied for the job, a former saleman was hired to fill the position. Plaintiff testified that when the new manager took over, he referred to her as "honey" and "baby" in a denigrating manner, and that this became constant after plaintiff asked him to stop. At the end of November 1990, plaintiff and her former sales manager were caught in a sexual relationship by his wife. This information soon became public knowledge at the dealership. After a dispute with the new manager about her hours, and a dispute about her commission on a fleet of vehicles, plaintiff resigned on January 3, 1991.

Plaintiff brought this action against Hinckley Dodge and several of its employees in the United States District Court for the District of Utah. Eventually, the claims against the individual employees were dismissed, and the remaining claim against Hinckley Dodge was tried to the court. At trial, the dealership presented evidence that plaintiff was mistreated for reasons other than her gender. Witnesses testified that plaintiff was very aggressive, that she took more than her share of customers and became involved in other people's sales, and that she had a special relationship with the sales manager which resulted in preferential treatment and unearned commissions at the expense of others.

The district court found that the incidents described above occurred, but concluded that they were not sexual harassment because the mistreatment occurred for reasons unrelated to gender. Specifically, the court found that the mistreatment was motivated by jealousy, dislike of plaintiff, and anger at the perceived preferential treatment plaintiff received based on her special relationship with the sales manager. Because the motivation behind the mistreatment of plaintiff was gender neutral, the court found that plaintiff had not been sexually harassed. The court also found that the dealership took adequate remedial action, that plaintiff was not constructively discharged, and that she failed to mitigate her damages.

## II.

We review the district court's findings of no sexual harassment, adequate remedial measures, and no constructive discharge, under a clearly erroneous standard. *Hicks v. Gates Rubber Co.,* 928 F.2d 966, 971 (10th Cir.1991)("District court fact findings in a . . . sexual harassment case are examined for clear error."); *Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 578 (10th Cir.1990)(reviewing findings of adequate remedial action and no constructive discharge for clear error). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84

L.Ed.2d 518 (1985)(quotations omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574, 105 S.Ct. at 1511.

■ Sexual harassment under Title VII can be shown under one of two principal theories: quid pro quo discrimination or hostile work environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). This case involves the second theory. A hostile work environment exists when a plaintiff is subjected to sexual harassment "sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. at 2405 (citation omitted). Sexual harassment is behavior "'that would not occur but for the sex of the employee'.... 'If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination.'" *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1537 (10th Cir.1995) (citations omitted).

■ Plaintiff argues that many of the incidents described above were inherently sexual in nature, and that, therefore, the district court erred in finding no sexual harassment. We agree. Although some of the incidents were gender neutral, i.e., the invasion of plaintiff's desk, the blocking of the doors, the door slamming, the hood slamming, and the spiked drink, the other incidents occurred only because plaintiff was a woman. That is, even if the motivation behind plaintiff's mistreatment was gender neutral, as found by the district court, the manner in which her coworkers expressed their anger and jealousy was not. Rather, plaintiff's coworkers often chose sexually harassing behavior to express their dislike of plaintiff, conduct which would not have occurred if she were not a woman.

It is beyond dispute that the incident with the salesman during plaintiff's first week was overtly sexual. A man's act of pushing a woman against a wall, placing his knee between her legs, and calling her a "f'ing bitch," can be nothing other than sexual harassment. So too, the cartoon directed at plaintiff, depicting a woman pulling up her skirt and spreading her legs, was overtly sexual and harassing.

■ The names plaintiff was called, both verbally and in the form of notes, were also sexual in nature. "It is beyond dispute that evidence that a woman was subjected to a steady stream of vulgar and offensive epithets because of her gender would be sufficient to establish a claim under Title VII...." *Gross,* 53 F.3d at 1539; *see also Katz v. Dole,* 709 F.2d 251, 254 (4th Cir.1983)(holding that sexual harassment includes the use of "extremely vulgar and offensive sexually related epithets addressed to and employed about [plaintiff]"). Such words are recognized as "intensely degrading, deriving their power to wound not only from their meaning but also from 'the disgust and violence they express phonetically.'" *Id.* (citation omitted).

Over the course of her employment, plaintiff was called a "whore," "floor whore," "curb whore," "curb side cunt," and "bitch," on a consistent basis. These sexual epithets have been identified as "'intensely degrading' to women." *Jenson v. Eveleth Taconite Co.,* 824 F.Supp. 847, 883 (D.Minn.1993)(quoting *Katz,* 709 F.2d at 254); *see Burns v. McGregor Electronic Indus., Inc.,* 989 F.2d 959, 964 (8th Cir.1993)(noting that use of "bitch," "slut," and "cunt," to woman was harassment based on her sex); *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 902 (11th Cir.1988)(detailing incidents of sexual harassment, including comments by other salesmen calling plaintiff a "bitch" and a "whore"); *EEOC v. A. Sam & Sons Produce Co.,* 872 F.Supp. 29, 35–36 (W.D.N.Y.1994)(holding that "the term 'whore' is usually gender-specific and is certainly more offensive when directed at a woman," and noting that "a man calling a woman a 'whore'—thereby reducing her to an illicit sexual being—is a direct affront to her self-respect rather than a simple vulgarity that might offend her sensibilities")(footnote omitted).

■ The words "honey" and "baby," although not overtly sexual, may be sexual in nature if their use occurs based only on the

recipient's gender. *See Hicks*, 928 F.2d at 971; *Jenson*, 824 F.Supp. at 880 (holding that "pet names" and terms that persons in romantic relationships might use such as "honey" and "babe" are sexual in nature). We express no opinion whether the use of such terms, in and of themselves, could create a hostile work environment. In this case, however, we are constrained to view the new manager's use of "honey" and "baby" as part of the pattern of sexually derogatory names directed at plaintiff.

The fact that plaintiff's abuse was motivated by gender neutral reasons is irrelevant. The Ninth Circuit faced a similar situation in *Steiner v. Showboat Operating Co.*, 25 F.3d 1459 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995), where plaintiff's supervisor called her sexually explicit names and publicly suggested that she perform a sexual act with customers. *Id.* at 1461. The district court held that the supervisor's conduct was not sexual harassment because he was consistently abusive to both men and women, and therefore the behavior was not based on plaintiff's gender. The appellate court reversed, holding that although the supervisor abused both men and women, the abuse of women was different because it "relied on sexual epithets, offensive, explicit references to women's bodies and sexual conduct." *Id.* at 1463. Noting that "[i]t is one thing to call a woman 'worthless,' and another to call her a 'worthless broad,'" the court held that the supervisor's abuse of plaintiff centered on the fact that she was female. *Id.* at 1464; *see also Burns*, 989 F.2d at 965 (rejecting claim that verbal abuse was gender neutral because it was motivated by dislike of plaintiff, noting that dislike of plaintiff did not excuse subjecting her to a "steady stream of sexual harassment").

Testimony by defendant's former manager that "floor whore" is an industry term does not negate its sexually derogatory character. Just as we would not sanction an industry term that is facially derogatory to a particular racial or ethnic group, we cannot accept the argument that industry use of an inherently sex-related term neutralizes its detrimental effect on women. Moreover, there is no evidence that the term was directed at any other salesperson during plaintiff's employment.

■■■■ Defendant and the trial court appear to believe that plaintiff's involvement with the sales manager somehow "invited" the other salesmen's conduct. However, "[a] person's private and consensual sexual activities do not constitute a waiver of his or her legal protections against unwelcome and unsolicited sexual harassment." *Katz*, 709 F.2d at 254 n. 3. While plaintiff's coworkers may have been angry at the perceived special treatment she received as a result of her relationship, this did not give them license to sexually harass her.

■■■ We conclude that the district court clearly erred in finding no sexual harassment, in light of the sexually explicit statements, pictures, and notes directed at plaintiff, and the sexually offensive physical contact to which plaintiff was subjected by one of her coworkers.[1] We also conclude that the incidents were sufficiently pervasive as to create a hostile work environment. *See Harris v. Forklift Sys., Inc.*, —— U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)(identifying factors to be considered in determining whether environment is hostile). The uncontradicted evidence demonstrates "an environment that a reasonable person would find hostile or abusive." *Id.* at ——, 114 S.Ct. at 370.

1. Although there was a sexual content to the rumors of a relationship between plaintiff and the sales manager, and the statements attributing her success to such a relationship, the district court's finding that the rumors and comments were gender neutral is not clearly erroneous. Based on observed behavior, there was strong evidence that plaintiff and her manager had a special relationship, and that plaintiff's success was due, in some part, to this relationship. It appears that such rumors and inferences would have occurred even if the roles were reversed and plaintiff were male. This is different than the situation in *Jew v. University of Iowa*, 749 F.Supp. 946, 950, 958 (S.D.Iowa 1990), where there was no basis for the rumors other than Dr. Jew's gender, and *Spain v. Gallegos*, 26 F.3d 439, 443 (3d Cir.1994), where the rumors were not true but were created and perpetuated by improper conduct by plaintiff's supervisor.

■ Finally, we conclude that the district court clearly erred in finding that the dealership took adequate remedial action. The record is clear that despite plaintiff's numerous complaints, the management of Hinckley Dodge took no action to remedy the situation with the sole exception of terminating a salesman who abused plaintiff in front of customers. When plaintiff complained to her manager, he told her that it was a tough business, that she was working with a lot of men who were unhappy with her success, and that she should simply "grit her teeth and hang in there." None of the salesmen who sexually harassed plaintiff were reprimanded or disciplined in any way. *Compare Hirschfeld*, 916 F.2d at 578 & n. 6 (noting that remedial steps may include reprimand, brief suspension, demotion, or discharge, and holding department's placement of offender on administrative leave and subsequent demotion were "expeditious and effective"). Further, as it is undisputed that the name-calling, pictures, and notes continued throughout plaintiff's employment, the dealership's actions were plainly ineffective.

## III.

■ We turn now to the remedy, if any, to which plaintiff was entitled. This case arose under Title VII prior to its amendment in 1991. Under pre–1991 law, plaintiff could not obtain compensatory damages, but was restricted to the traditional equitable remedies of reinstatement, back pay, and front pay, as well as declaratory and injunctive relief. *See Landgraf v. USI Film Prods.*, —— U.S. ——, —— - ——, 114 S.Ct. 1483, 1490–91, 128 L.Ed.2d 229 (1994); *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1347 (10th Cir.1994). "[E]ven if unlawful discrimination was proved, under prior law a Title VII plaintiff could not recover monetary relief unless the discrimination was also found to have some concrete effect on the plaintiff's employment status, such as a denied promotion, a differential in compensation, or termination." *Landgraf*, —— U.S. at ——, 114 S.Ct. at 1491; *see also Derr v. Gulf Oil Corp.*, 796 F.2d 340, 342 (10th Cir. 1986)("[T]he remedies of back pay and reinstatement are not available to [plaintiff] unless she was constructively discharged.").

■ Here, plaintiff alleged that she was constructively discharged as a result of the sexual harassment to which she was subjected. A Title VII claimant "bears the burden of proving she was constructively discharged by a preponderance of credible evidence; mere uncontroverted evidence, if not credible, is insufficient." *Hirschfeld*, 916 F.2d at 580. To meet her burden, the plaintiff was required to show that she was "forced to quit due to [gender]-based intolerable working conditions." *Bolden v. PRC, Inc.*, 43 F.3d 545, 552 (10th Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995).

■ The district court found that even if the conduct of plaintiff's coworkers was sex-based, plaintiff left her employment for reasons unrelated to the sexual harassment. Specifically, the court concluded that plaintiff left Hinckley Dodge because of her relationship with the former sales manager, including the public exposure of their involvement in November 1990, the fact that he was no longer employed at the dealership, and the inference that plaintiff would no longer enjoy preferential treatment. As the record contains evidence to support these factual findings, the court's conclusion that plaintiff was not constructively discharged is not clearly erroneous. *See, e.g., Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir.1992)(no constructive discharge when plaintiff resigned for reasons unrelated to sexual harassment), *aff'd*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *see also Bolden*, 43 F.3d at 552 (no constructive discharge when plaintiff resigned for reasons unrelated to racial harassment). Therefore, the district court was correct in concluding that plaintiff was not entitled to Title VII relief.

■ The district court did not err in allowing discovery into plaintiff's relationship with the former manager in this case. Unlike the sexual conduct sought to be discovered in *Mitchell v. Hutchings*, 116 F.R.D. 481, 484 (D.Utah 1987), plaintiff's relationship with the sales manager was directly related to her claims that she was sexually harassed

by rumors of an affair and the inference that she received preferential treatment as a result of such a relationship.

Appellee's motion for attorney fees is DENIED. The portions of appellee's appendix which were not before the district court are ordered STRICKEN. The judgment of the United States District Court for the District of Utah is AFFIRMED.