**Janet L. UNREIN, Plaintiff,**

v.

**PAYLESS SHOESOURCE, INC., Defendant.**

**No. 97–4158–RDR.**

United States District Court, D. Kansas.

June 3, 1999.

Brenda L. Head, Davis, Unrein, Hummer, McCallister, Biggs & Head, L.L.P., Topeka, KS, for Janet L Unrein, plaintiff.

K. Gary Sebelius, Michael M. Walker, Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, Topeka, KS, Mark A. Ferguson, Lathrop & Gage L.C., Overland Park, KS, Rosalee M. McNamara, Lathrop & Gage L.C., Kansas City, MO, for Payless Shoesource Inc, defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is a Title VII action. Plaintiff brings this action against her former employer, Payless Shoesource, Inc. (Payless), for sexual harassment, sexual discrimination, retaliation and constructive discharge. This matter is presently before the court upon defendant's motion for summary judgment.

Plaintiff raises four claims against Payless: (1) from approximately May 1994 through November 1994 she was subjected to a hostile work environment due to her gender; (2) in December 1994, she was denied a promotion due to her gender; (3) in January 1995, she was retaliated against after she filed a charge of sex discrimination with the Kansas Human Rights Commission (KHRC) and Equal Employment Opportunity Commission (EEOC); and (4) on February 10, 1995, she was constructively discharged from her employment.

Payless contends that it is entitled to summary judgment on all of the claims made by plaintiff. Payless raises two arguments concerning plaintiff's sexual harassment claim. Payless contends that the harassing conduct was not based upon plaintiff's gender and was not sufficiently severe or sufficiently pervasive to alter the terms, conditions or privileges of plaintiff's employment. Payless also argues that the plaintiff's claim of a hostile work environment is barred because she failed to avail herself of Payless' sexual harassment policy. Payless next argues that the plaintiff's claim of sexual discrimination based upon her failure to receive a desired promotion must fail because no genuine issue of material fact supports plaintiff's contention. Payless makes similar arguments concerning plaintiff's retaliation claims. Finally, Payless asserts it is entitled to summary judgment on plaintiff's constructive discharge claim because the evidence in this record fails to support it.

The general guidelines for analyzing summary judgment motions were reviewed by the Tenth Circuit in *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993):

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); accord *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Russillo v. Scarborough*, 935 F.2d 1167, 1170 (10th Cir. 1991). The moving party bears the initial burden of showing that there is an absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). To sustain this

burden, the non-moving party cannot rest on the mere allegations in the pleadings. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Applied Genetics Intern., Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990).

In order to fully understand the nature and substance of the plaintiff's claims, the court intends to produce an extended version of the facts. In evaluating the defendant's motion, the court has examined a lengthy factual statement from the parties, excerpts from over ten depositions, and a variety of documents and other materials. The record is extensive, to say the least. Most of the relevant facts in this case are not in dispute.

## FACTUAL BACKGROUND

*Plaintiff's Employment with Payless*

Plaintiff graduated from high school in 1972 and received an associate's degree in mental health from Washburn University in 1982. She began working for Payless on or about July 23, 1985 as a maintenance support clerk where she was responsible for inventory control for maintenance parts. In October 1986, plaintiff began working as a payroll clerk for Payless.

In July 1990, plaintiff was promoted to an Administrative Supervisor position wherein she had many of the same job duties she had in the payroll position, but also took on additional responsibilities in clerical areas. As Administrative Supervisor, plaintiff was ultimately responsible for supervising a total of seven employees which included payroll clerks, generalized clerks, and a telly card clerk.

In 1992 plaintiff took on the additional responsibility of supervising the purchasing function of the Distribution Center which included her supervising an additional employee. As a Payroll Supervisor, plaintiff's responsibilities included: supervising employees to ensure Distribution Center employees were paid in an accurate and timely manner; keeping accurate records of all employees' attendance and vacation; maintaining adequate controls on the Distribution Center payroll process; meeting all upcoming deadlines; assuming responsibility for all manual payroll adjustments and identified pay rate discrepancies; preparing administrative reports; organizing and presenting data for weekly financial forecasts; providing data and input for seasonal operation budgets, pay rates and vacation analysis; communicating with management concerning payroll related issues; and, producing and tracking other information as required.

*Hostile Work Environment*

In 1992, plaintiff was supervised by Frank Schreiner, who was the Manager of Inventory Control. In April of 1993, plaintiff received her job performance evaluation for 1992 and was rated as "outstanding." In early 1993, Lance Robinson assumed Schreiner's position and became plaintiff's supervisor. Robinson also supervised Bill Jackson, the Supervisor of Inventory Control.

Plaintiff and Robinson had a good relationship during his first months of supervision. Plaintiff and her husband socialized with Robinson and his wife during this period. On April 2, 1993, plaintiff's husband was involved in a serious automobile accident. In the months following the accident, plaintiff took time off work to care for her husband. Plaintiff believed that her relationship with Robinson changed during this period. He made it known to her that he believed she was abusing her leave benefits. Robinson, however, never disciplined plaintiff for her time away from work or threatened to demote her. Plaintiff began taking notes at that time concerning the treatment she was receiving from Robinson. By July 1993, plaintiff determined that their relationship had deteriorated.

During the remainder of 1993, plaintiff noted the following three incidents involving Robinson that she believed were abusive: (1) opened confidential mail on July 26, 1993; (2) went through items on her desk and told her that he could do so anytime he wanted on July 29, 1993; and (3) treated her poorly in directing her to

do some computer work after she told him of the need to do it.

In April 1994, Robinson provided plaintiff with an evaluation of her job performance for 1993. In the evaluation, Robinson gave her an "effective" rating. Plaintiff did not agree with Robinson's appraisal of her performance in 1993 because she felt it was in retaliation for disagreements they had experienced throughout the year regarding her use of sick leave benefits.

On April 28, 1994, plaintiff met with Galen Erickson, the Director of the Distribution Center, and Robinson. According to plaintiff's notes regarding this meeting, Robinson said he wanted to discuss the issues between he and the plaintiff "because he didn't want his boss (Galen Erickson) to think there were sexual harassment issues going on. I [plaintiff] said I have never used the term sexual harassment in any discussion I had with Galen."

Part of plaintiff's claim of sexual harassment involves three issues discussed during the April 28, 1994 meeting between plaintiff, Erickson and Robinson. These issues involved: (1) Robinson's alleged perception that plaintiff abused her benefits during her husband's injury as a result of an automobile accident; (2) Robinson allegedly saying that he wished plaintiff had taken a leave of absence but that she could not afford to; and (3) Robinson's mentioning that plaintiff had left work on a number of occasions because she was emotionally upset due to her circumstances. Plaintiff felt Robinson's implication regarding her not being able to take a leave of absence was that she was the "family bread winner."

Shortly before May 11, 1994, Jim Feeney, Payless' Vice President of Employee Relations, received a telephone call from Erickson indicating that Robinson had come to see him. Erickson said that Robinson was having problems doing his job and was upset because of some interpersonal problems he was having with plaintiff. Erickson indicated that the two of them had been to see him and that he had

talked to each of them separately and felt that there was a concern related primarily to a performance appraisal that plaintiff had recently been given and that Robinson and plaintiff were having trouble resolving it on their own. Erickson asked Feeney whether he would come over to the Distribution Center to meet with the two individuals to see if there was some way to address the appraisal issue so the two could move forward as a supervisor and subordinate.

On May 11, 1994, plaintiff had a meeting with Feeney. Plaintiff shared with Feeney the alleged incidents she had experienced with Robinson, and they also discussed plaintiff's performance appraisal. Plaintiff does not believe she told Feeney that she was being treated improperly by Robinson because she was a female. Plaintiff told Feeney that Robinson had attempted to own up to his responsibility by apologizing to her for some of his behavior.

During the remainder of her employment with Payless, plaintiff said that she suffered the following abuse by Robinson: (1) on one occasion, Robinson interrupted a conversation she was having with an employee in order to have her sign her appraisal; (2) in June 1994, Robinson, without any advance notice, sent her an e-mail indicating that he was going to be gone the following day for a seminar; (3) when Payless had informal departmental lunches, Robinson would bring tomatoes which he expected plaintiff to prepare for him; (4) Robinson gave her a cartoon for a seminar entitled "The Indispensable Secretary" which he modified to show himself as a genie and plaintiff as the secretary in the cartoon with a balloon caption above the genie's head reading "you're already indispensable"; (5) Robinson interrupted a closed door conversation she was having with one of her employees and asked her to do something which he had been requested to do for a superior; (6) on October 6, 1994, Robinson berated other male and female managers who were present at

a meeting; (7) on November 6, 1994, Robinson berated warehouse employees; (8) on two occasions, Robinson belatedly got information to her regarding reports that she was supposed to generate; (9) Robinson asked her to write a job description for the mail delivery person; and (10) Robinson referred to other females in the plant on numerous occasions as "bitches."

Jackson also complained about the treatment he received from Robinson. Management at Payless was aware of Robinson's management style and personality. Several males in management found Robinson difficult with which to deal. He was known to be abrasive and pompous towards plaintiff and a number of other people who had direct interactions with him. In the fall of 1994, Robinson was sent to a personal skills workshop by Payless. Robinson's superiors had discussed their observations about Robinson's behavior and complaints they had received and determined it would be appropriate to send Robinson to a seminar to help work on his interpersonal skills. During the latter part of November 1994, Robinson resigned his employment with Payless. His last day was December 9, 1994. Following Robinson's resignation, plaintiff assumed Robinson's duties on an interim basis as they pertained to her position. She was not given the entirety of Robinson's position since she was not given supervisory responsibility over Bill Jackson.

*Position of Manager of Inventory Control/Finance/Planning*

In May 1991, Mike Burton graduated from Kansas State University with a 3.8 grade point average. He received a Bachelor's of Science degree in Business Management with an emphasis in Management Information Systems. He was hired immediately by Payless in May 1991. When he was initially hired, Burton was hired as a Corporate Management Associate ("CMA") for two months through August 5, 1991, and then he was promoted to an Operation Supervisor position from August of 1991 to October of 1992. The CMA program is a two-month orientation of Payless in which recent college graduates who meet certain criteria are oriented with Payless and have a chance to meet the leadership of the corporation. Each individual in the CMA program spends approximately a month and a half working within each function of the distribution center in store operations, in Payless stores, and at the corporate office. Upon completion of the orientation the employee is assigned an initial assignment.

From October 1992 through March 1994, Burton was a Production Planning Supervisor. In March 1994, Burton was promoted to a Staffing Coordinator position at defendant's Distribution Center. On or about November 30, 1994, Ken Mayer, defendant's Manager of Industrial Relations, informed Joe Neal, defendant's Vice President of Physical Distribution, that Burton had an issue regarding a promotion he did not receive and which caused dissatisfaction on Burton's part.

Mayer tendered his resignation of employment with Payless in October of 1994. Mayer's resignation date became effective December 31, 1994.

On or about December 9, 1994, Burton resigned his employment with Payless because he had received an offer from the Target organization which he felt was an outstanding opportunity. Burton submitted his resignation to Erickson. During the latter part of 1994 or early 1995, Erickson left his employment with defendant.

On December 11, 1994, Bill Michener, Senior Vice President of Physical Distribution, contacted Burton indicating he was extremely disappointed that Burton was resigning and wanted to meet with him the next day to discuss why he was leaving. Michener met with Burton and advised him that Payless believed Burton was very promotable and that Robinson had vacated his position and there might be an opportunity there. Michener also provided some insight into changes which were going to occur at the Distribution Center. Michener informed Burton that Payless wanted to retain his services.

Subsequently, Burton met with several Payless officials, including Neal, about his resignation. He was again informed that Payless wanted to retain his services, and he was questioned about the possibility of whether he would be interested in the position vacated by Robinson. Payless officials believed that Burton was someone who had already proven himself, was well thought of and was considered high potential within the corporation. Payless did not want to lose Mike Burton because of his extensive involvement in the staffing strategy project that developed a whole new plan for how Payless was going to staff its Distribution Center and manage its employees and resources. Burton was also involved in a number of operational projects that were ongoing. In addition, with Robinson and Erickson leaving, Burton was the last remaining person that had continuity in the ongoing projects. Further, Burton was considered to be an outstanding performer and had excellent qualifications.

On December 13, 1994, a document was developed listing various alternatives for Burton. One of the positions identified as a possibility for Burton was the Manager of Inventory Control/Finance/Planning position. This position combined the production planning which Burton was already responsible for and the Inventory/Finance Manager position which had previously been the responsibility of Robinson. The memorandum also contained other alternatives for Burton; however, the recommendation was to offer Burton the Manager Finance/Inventory Control/Production Planning position with the understanding that he would be considered for a Change Process Manager position when the position became available.

On December 16, 1994, Neal contacted Burton indicating he wanted to speak with him later that day. In their meeting, Neal provided Burton a formalized example of a career path laying out dates, position titles and other information regarding what Burton's future might hold with Payless. The second part of the meeting was a presentation of a job description of a Manager of Finance/Inventory Control/Production Planning which was a restructured position incorporating Robinson's position and Burton's current job responsibilities. Burton was offered the Manager of Finance/Inventory Control/Production Planning position with the same base salary he would have received had he gone to Target, and he also was offered a $5,000.00 bonus as an incentive for him to stay with Payless. Burton left the meeting advising that he would consider the offer but needed to discuss the matter with his wife and family and would get back to Neal at a later date. On December 19, 1994, Burton accepted the offer.

Plaintiff and Jackson expressed an interest in the position vacated by Robinson, as did Ken Dost, Darrell Revell and Andy Thiele. Dost was involved with audit and finance; Revell was the Manager of Inventory Control, which was a higher position than Robinson's previous position; and Thiele was in a supervisory position. None of these individuals was interviewed or considered for the newly created position.

On or about December 20, 1994, plaintiff learned from Mayer that Burton had received the position which included Robinson's duties. On or about December 21, 1994, plaintiff met with Neal to discuss why Burton was promoted. Neal explained to plaintiff the rationale for filling the position. Neal told her that Burton had the background for the position.

*Deb Yetter Incident*

Shortly after Burton assumed the Manager Finance/Inventory Control/Production Planning position, Robin St. Claire, Kathy Petzold and Ruth Winder, all of whom reported to plaintiff, approached Burton and voiced their discontent with a number of things that were going on within the payroll department overseen by plaintiff. They advised Burton of some inconsistencies they perceived with Deb Yetter, a long-time friend of plaintiff's who had been hired by plaintiff as a temporary employee, including Yetter leaving early,

coming in late and taking extremely long lunches. They also complained about treatment they received from plaintiff; their belief that Deb Yetter was being given preferential treatment; and also adamantly complained about being afraid to say anything to plaintiff because they felt she would make them feel bad by "going off" on them. Another individual who reported directly to plaintiff resigned over plaintiff's treatment of her, indicating to Burton that "she had worked for a bitch in her prior job and she was not going to continue to work for a bitch here [at Payless] and that she was leaving."

Burton had Don McCunniff, Payless' Human Resources Supervisor, conduct some research regarding Yetter's time worked at Payless and compared the representations on the time sheets to Yetter's reported time as reflected by time log sheets and video cameras. Burton had McCunniff prepare a log showing inconsistencies regarding Yetter's time reflected in her payroll sheets as compared with her log-in times. Burton also directed McCunniff to gather the bills submitted to Labor Ready, the agency who provided Yetter as a temporary employee, regarding Yetter's work time and to gather the visitors sign-in log. Subsequently, Burton made the determination to sit down with plaintiff and give her an opportunity to explain in as much detail as she would like the inconsistencies between the amount of time paid to Yetter and the amount of time Yetter worked.

Burton had a follow-up meeting with plaintiff the same day. He indicated that he appreciated her cooperation on the subject and that, based upon the information known to him, it was in the best interest of Payless to terminate Yetter.

Burton also counseled with McCunniff and Feeney regarding what type of documentation should be prepared to ensure that the payroll improprieties did not occur again. As a result of that meeting, the following memorandum was given to plaintiff on January 20, 1995:

As discussed today, this memorandum is being given to you as a written confirmation of our conversation regarding your failure to maintain control over the business assets entrusted to you insofar as maintaining adherence to work schedules in your department and the authorization of pay hours for employees reporting to you. Please understand that the company regards this kind of failure as serious enough to include it as part of the code of conduct as an infraction which ordinarily leads to termination without prior counseling. Please understand that recurrence could form the basis for termination without additional counseling. I am hopeful that you will accept this counseling in the constructive fashion in which it is intended and that there will be no need in the future to address similar concerns.

Plaintiff had formally advised Payless of her allegation of discrimination on January 13, 1995. She filed a charge of discrimination against Payless on January 20, 1995 with the Kansas Human Rights Commission and the Equal Employment Opportunity Commission.

*Plaintiff's Decision to Leave Employment of Payless*

In February 1995, plaintiff approached Burton and indicated that she had become exhausted. She advised Burton that she did not have an issue with him, but she did not have the energy or the drive to train a seventh boss and felt that maybe going into a different position in operations would give her an opportunity to have an objective standpoint on her position. Shortly thereafter, plaintiff indicated that she thought she would like to take some time off to develop an objective viewpoint and felt that taking a block of time off for a while would help her out. Burton told plaintiff he did not have the authority to grant her leave but would figure out what options were available to her and get back with her. Burton sought counsel from McCunniff and Feeney regarding what options were available to plaintiff. Burton

eventually told plaintiff that she had three options: (1) she could use sick time if she was diagnosed by a doctor and found to need hospitalization; (2) she could use the remainder of her 1994 vacation and Payless would advance her 1995 vacation time; or (3) she could take an unpaid leave of absence. Plaintiff was told that, in order to use the sick leave, she would need a statement from a licensed practitioner, not a social worker.

Two days later plaintiff resigned her employment with Payless. As Burton read through her resignation letter, he asked her whether she was sure she really wanted to do this. He was caught off guard by plaintiff's resignation. Burton understood that plaintiff was unhappy, but at no point and time did she give him any indication she was going to resign. He did not want her to resign. Burton repeatedly asked plaintiff whether she was sure she wanted to resign, whether she was okay, or if there was anything he could do for her.

Burton's conduct did not contribute to plaintiff's decision to leave her employment with Payless. Burton indicated to plaintiff that she should call him if she had any questions or concerns. She felt that he was genuinely interested in her welfare at that time.

## HOSTILE WORK ENVIRONMENT

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive working environment." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). A hostile work environment exists when a plaintiff is subjected to sexual harassment "sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 67, 106

S.Ct. 2399 (citation omitted). The existence of sexual harassment must be determined "in light of 'the record as a whole' and [courts must examine] 'the totality of [the] circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.'" *Id.* at 69, 106 S.Ct. 2399 (citation omitted). Not all harassment will affect a term, condition or privilege of employment. The mere utterance of a statement which "'engenders offensive feelings in an employee' would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." *Id.* (citations omitted).

Sexual harassment is behavior "'that would not occur but for the sex of the employee.'" *Gross v. Burggraf Construction Co.,* 53 F.3d 1531, 1537 (10th Cir.1995) (citation omitted). Whether an environment is "hostile" or "abusive" is determined by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so. *Id.* at 21–22, 114 S.Ct. 367.

In order to survive summary judgment, plaintiff must show facts that support an inference of a sexually hostile environment and support a basis for liability. *See Bolden v. PRC, Inc.,* 43 F.3d 545, 551 (10th Cir.1994), *cert. denied,* 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995). Plaintiff must show specifically under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was sexual or stemmed from sexual animus. *Id.*

"General harassment if not … sexual is not actionable." *Id.*

Plaintiff's sexual harassment claim is based upon treatment she received from her supervisor, Lance Robinson. The record contains several incidents that plaintiff contends constitute sexual harassment by Robinson. The court has set forth these incidents in some detail in order to fully assess the totality of the circumstances faced by the plaintiff.

■ In examining the incidents of alleged sexual harassment, the court must agree with Payless that most of these occurrences are devoid of any indication that they happened due to plaintiff's gender. The incidents reflect a series of disagreements, perceived slights and philosophical differences that commonly occur in the workplace, regardless of the genders of the individuals involved. Plaintiff has failed to identify a single incident in which a gender specific comment or sexually charged comment was directed at her by Robinson. Plaintiff acknowledges that Robinson made no sexual advances and engaged in no inappropriate touching. Plaintiff indicates only that Robinson treated her poorly on a number of occasions. The record, however, fails to support the allegation that Robinson treated males in any different manner than he treated plaintiff. To the contrary, the record shows that Robinson had personality conflicts with persons of both genders and was ultimately made to attend an interpersonal skills workshop in an attempt to alleviate the problem. As stated previously, general harassment if not sexual is not actionable. *See Hartsell v. Duplex Products, Inc.,* 123 F.3d 766, 773 (4th Cir.1997) ("Title VII does not guarantee a happy workplace, only one free from unlawful discrimination.").

The court finds no evidence that any of Robinson's conduct was motivated by plaintiff's gender. Most of the incidents are entirely gender neutral, i.e., interrupting her, giving her a poor evaluation, opening her mail, going through her desk, advising her he could do anything he wanted,

and giving her the indispensable cartoon. The only arguably gender-related conduct noted by the plaintiff is Robinson's references to women as "bitches" and Robinson's request to plaintiff to dice some tomatoes for him, i.e., to do women's work for him. We use the term "arguably" because neither of these incidents is clearly sexual in nature. A request by a supervisor to a subordinate to perform a task such as preparing food for him is not inevitably gender related, but may be depending on context. The same can be said for the use of the term "bitch." *See Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164, 1167–68 (7th Cir. 1996) (noting that although "bitch" is not inevitably a gender-related term, it may be depending on context). Nevertheless, for the purposes of the instant motion, the court shall consider both of the matters as gender related. Even with consideration of these two incidents as gender related, we are not persuaded that a reasonable jury could conclude that the actions taken by Robinson against plaintiff were motivated by her gender. *See Moore v. Grove North America, Inc.,* 927 F.Supp. 824, 829 (M.D.Pa.1996) (female subordinate not subjected to hostile work environment by male supervisor where supervisor would not listen to her, made her feel she was "bothering him" when she spoke to him, was contemptuous with her, called her a "child," and made her feel as though she did not know what she was talking about because no evidence that supervisor's actions were motivated by subordinate's gender).

■ Moreover, the court does not find that the alleged harassment, assuming arguendo that the conduct of Robinson was gender based, was pervasive or severe enough to alter the terms, conditions or privilege of employment. When one considers the totality of the circumstances, we fail to see harassment that was either pervasive enough or severe enough to sustain liability against the defendant. The incidents here, either singularly or collective-

ly, are not severe enough to constitute sexual harassment. In addition, they are not pervasive enough. The occurrences are sporadic in nature, in that they occur over a two-year period. They do not constitute the steady barrage of incidents that would justify liability against the defendant. The Supreme Court has repeatedly emphasized that this cause of action is limited to extreme work conditions. *See Faragher v. City of Boca Raton,* 118 S.Ct. at 2284 ("conduct must be extreme to amount to a change in the terms and conditions of employment"); *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (requirement that conduct be severe or pervasive is "crucial"). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive"—is not actionable. *Harris,* 510 U.S. at 21, 114 S.Ct. 367. The court does not find that the incidents noted by the plaintiff are either severe or pervasive enough to constitute a hostile work environment.

Plaintiff has suggested that Payless has attempted to isolate her various claims of discriminatory conduct in an effort to recast them collectively in a light more favorable to it. Plaintiff has also suggested that she was subjected to "abusive situations" on an ongoing "day-to-day" basis. The court is not persuaded that an evaluation of the record supports the plaintiff's contentions. The court has attempted to evaluate the totality of circumstances and, in doing so, has attempted to assess the gender-neutral incidents as well as the other incidents that suggest sexual harassment.

Plaintiff contends that *Winsor v. Hinckley Dodge, Inc.,* 79 F.3d 996 (10th Cir. 1996) supports her position in this case. The court disagrees. In *Winsor,* the plaintiff had asserted a Title VII claim against her employer, a car dealership. She contended that she had been sexually harassed while she was employed as a car salesman. The district court had granted summary judgment to the defendant, find-

ing that incidents noted by the plaintiff were gender neutral. The Tenth Circuit reversed, concluding that the plaintiff was the victim of sexual harassment since, even if the motivation behind her mistreatment was gender neutral, the manner in which her co-workers expressed anger and jealousy was not neutral. The Tenth Circuit noted an employer cannot argue that sexually offensive epithets are gender neutral merely because a supervisor was generally coarse to employees of both genders. *Id.* at 1001. In reaching this conclusion, the *Winsor* court cited *Steiner v. Showboat Operating Co.,* 25 F.3d 1459 (9th Cir.1994), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995), which rejected an argument claiming the supervisor's conduct was gender neutral because although the supervisor abused both men and women, the abuse of women was different when it "relied on sexual epithets, offensive, explicit references to women's bodies and sexual conduct" and recognized "it was one thing to call a woman 'worthless' and another to call her a 'worthless broad.'" *Winsor,* 79 F.3d at 1001. Applying this rationale, the *Winsor* court determined that while the term "floor whore" may have been an industry term, it could not be deemed gender neutral. *Id.*

As correctly pointed out by Payless, Payless is not trying to ascribe a gender neutrality label on sexist remarks by claiming both males and females endured coarse conduct. Rather, plaintiff is seeking to try to color gender-neutral conduct as sexual based solely on the circumstance that she happens to be female and her past supervisor, whom both male and female co-workers found to be unpleasant to work with, was male. Such an effort cannot prevail absent some evidence of gender related conduct.

This case has some similarities to *Penry v. Federal Home Loan Bank of Topeka,* 155 F.3d 1257 (10th Cir.1998), although the conduct here does not rise to the level found in that case, a level that the Tenth Circuit concluded did not demonstrate a

sexually hostile work environment. There, two female employees of the Federal Home Loan Bank (FHLB) alleged that they had been subjected to sexual harassment during their employment by their male supervisor. They noted a variety of inappropriate comments and behavior by their supervisor between 1990 and 1993. The incidents and conduct by their supervisor included inferring to hotel clerks that he and the plaintiffs were sharing a room, taking the plaintiffs to Hooters restaurant, requesting that the plaintiffs work in his hotel room, asking one of the plaintiffs if she had wet dreams, asking one of the plaintiffs what she was wearing under her dress, pointing out to the plaintiffs that the roof of a particular mall was shaped like a woman's breasts, standing and staring at one of the plaintiffs, repeatedly trying to look down the front of one of the plaintiff's blouses, telling plaintiffs to "bring your buns over here," and needlessly touching plaintiffs on many occasions. The district court granted summary judgment to the defendant, finding that the conduct was not severe or pervasive enough to create an environment that a juror could find hostile and abusive. The Tenth Circuit affirmed. The Tenth Circuit disagreed slightly with the analysis employed by the district court, but nevertheless agreed that the conduct was insufficient to demonstrate a hostile work environment. The Court did find, contrary to the conclusion of the district court, that the supervisor's trips to Hooter's, a restaurant whose marketing theme is based on its well-endowed female waiting staff and whose name aims to attract business with a double entendre implicating the female anatomy, were gender related as were the supervisor's comments about the mall roof. Even with this reevaluation of the evidence, the Tenth Circuit concluded that the district court had correctly determined that a rational jury could not find that plaintiffs' workplace was permeated with discriminatory intimidation. *Id.* at 1263. The Tenth Circuit explained:

> The vast majority of Waggoner's behavior set forth in the plaintiffs' 200-paragraph statement of facts seems motivated by poor taste and a lack of professionalism rather than by the plaintiffs' gender. What made the plaintiffs' environment hostile, if anything, was not the gender-based incidents but instead the gender-neutral antics perpetrated by Waggoner throughout his four-year career at FHLB. "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment." *Stahl v. Sun Microsystems, Inc.,* 19 F.3d 533, 538 (10th Cir.1994).

*Id.*

The comments of the court in *Penry* are equally applicable here. The record discloses that Robinson's behavior here, although loutish and unprofessional, was not as sexually charged as that noted in *Penry*. In sum, the court finds, for the reasons previously stated, that even viewing the facts in the light most favorable to plaintiff, no reasonable jury could conclude that a sexually hostile work environment existed at Payless during plaintiff's employment. Accordingly, the court finds it unnecessary to consider the defendant's other argument that plaintiff's hostile work environment claim is barred because she failed to avail herself of the Payless sexual harassment policy.

## DISPARATE TREATMENT IN DENIAL OF PROMOTION

Plaintiff contends that she was discriminated against based upon her sex when she failed to receive a promotion to the position of manager of Finance/Inventory Control/Production Planning. She contends that she was denied the opportunity to apply for this position, denied consideration for the position, and ultimately denied the position which was given to a less qualified male because of her sex.

Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because

of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "The 'factual inquiry' in a Title VII case is '[whether] the defendant intentionally discriminated against the plaintiff.'" *U.S. Postal Service v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (citation omitted). "Title VII is not violated by the exercise of erroneous or even illogical business judgment;" thus, it is not a vehicle for second-guessing the employer's business judgment absent evidence of a discriminatory motive. *Sanchez v. Philip Morris Inc.,* 992 F.2d 244, 247 (10th Cir.1993).

Although direct or indirect evidence may be used to prove employment discrimination, in practice, plaintiffs typically offer only circumstantial proof because "there is rarely direct evidence of discrimination." *Ingels v. Thiokol Corp.,* 42 F.3d 616, 621 (10th Cir.1994). Since the plaintiff offers no direct evidence, she must rely on circumstantial evidence. The court applies the burden shifting procedures set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to evaluate whether the plaintiff can prove the defendant's discriminatory intent circumstantially. *Reynolds v. School Dist. No. 1, Denver, Colo.,* 69 F.3d 1523, 1533 (10th Cir.1995).

To survive summary judgment on her claim, the plaintiff first must establish a prima facie case that the employer engaged in the alleged discriminatory practice. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995). A rebuttable presumption of discriminatory intent arises from proof of a prima facie case. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Sorensen v. City of Aurora,* 984 F.2d 349, 352 (10th Cir.1993).

If the plaintiff succeeds in making a prima facie case, the burden shifts to the defendant who can rebut the presumption by articulating a legitimate, facially non-discriminatory reason for the adverse employment action being challenged. *McDonnell Douglas,* 411 U.S. at 802–03,

93 S.Ct. 1817; *Randle,* 69 F.3d at 451. "[T]he defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion." *E.E.O.C. v. Flasher Co., Inc.,* 986 F.2d 1312, 1316 (10th Cir.1992) (citations omitted). The employer's reason for the adverse action, however, "must be reasonably specific and clear." *Id.*

If the defendant employer makes this showing, the presumption of discrimination created by the prima facie case "simply drops out of the picture." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Ingels,* 42 F.3d at 621. "'At the summary judgment stage, it then becomes the plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e. unworthy of belief.'" *Marx v. Schnuck Markets, Inc.,* 76 F.3d 324, 327 (10th Cir.) (citation omitted), *cert. denied,* 518 U.S. 1019, 116 S.Ct. 2552, 135 L.Ed.2d 1071 (1996). A plaintiff may demonstrate pretext by proving either "'that a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence.'" *Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1455 (10th Cir.1994) (citation omitted). "If no facts relating to the pretextuality of the defendant's action remain in dispute, summary judgment is appropriate." *Hooks v. Diamond Crystal Specialty Foods, Inc.,* 997 F.2d 793, 798 (10th Cir.1993), *overruled in part on other grounds, Buchanan v. Sherrill,* 51 F.3d 227, 229 (10th Cir.1995). "[T]he Title VII plaintiff at all times bears the 'ultimate burden of persuasion.'" *St. Mary's Honor Center,* 509 U.S. at 511, 113 S.Ct. 2742 (citation omitted).

Payless initially argues plaintiff cannot establish a prima facie case of discrimination. Payless contends that plaintiff was not qualified for the position of manager of

Finance/Inventory Control/Production Planning. Payless asserts that plaintiff did not have the necessary experience or qualifications for the newly created position of manager of Finance/Inventory Control/Production Planning because her previous experience was limited to one facet of the finance department involving payroll. Payless also argues that it has established a legitimate, nondiscriminatory reason for not hiring plaintiff as the manager of Finance/Inventory Control/Production Planning and that plaintiff has not come forward with any evidence that its articulated reason was pretextual.

■ For the purposes of this motion, the court shall proceed directly to the issue of pretext. The court finds that Payless has provided a legitimate, nondiscriminatory reason for the promotion of Burton to this position. The court must now examine the evidence to determine if plaintiff has presented sufficient facts to avoid summary judgment on the pretextuality of Payless' decision.

Robinson's position opened when he left Payless' employment. Several male employees and plaintiff expressed interest in the position. Payless made the decision to consolidate Robinson's position with other duties and to create a new position based upon a previous needs assessment. The new position was awarded to Burton, who had indicated that he was resigning and going to work for a competitor. The circumstances concerning Payless' choice to hire Burton are not in dispute. Plaintiff has not challenged the pertinent facts concerning that decision. Payless felt the need to retain Burton because others in the Distribution Center had left or were going to leave Payless' employment. Burton was the only one left who had been involved in several significant projects. Payless wished to retain Burton because he was viewed as someone with special skills, and there was a need to maintain some continuity concerning these projects.

In considering this claim, the court notes that our sole focus is to determine if plaintiff did not receive the position because of her gender. We are not required to decide if Payless made a wise decision or even whether Payless could have made a better decision. Rather, we are limited to considering only whether plaintiff's gender played a part in this employment decision. *See Taken v. Oklahoma Corporation Comm.,* 125 F.3d 1366, 1370 (10th Cir. 1997) ("Favoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification."); *Doan v. Seagate Technology, Inc.,* 82 F.3d 974, 977–78 (10th Cir. 1996) (courts should not question business decisions in the absence of evidence of impermissible motives), *cert. denied,* 519 U.S. 1056, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997).

The court finds no evidence of gender discrimination in the decision by Payless to promote Burton to the position of manager of Finance/Inventory Control/Production Planning. Several other males and plaintiff expressed an interest in the position. Payless chose Burton for the reasons noted previously. Plaintiff has failed to demonstrate that the reasons offered by Payless were pretextual. Plaintiff is unable to point to any evidence showing discriminatory treatment. Without a showing that Payless' decision to hire is pretextual, plaintiff's claim of sex discrimination must fail. Accordingly, the court shall grant Payless summary judgment on this claim.

RETALIATION

Plaintiff contends that she was retaliated against in two ways by Payless. First, she contends that she was retaliated against for opposing unlawful employment practices when she was denied promotion to the position that was given to Mike Burton. Second, she contends that she was retaliated against for filing a charge of discrimination with the KHRC and EEOC when she was reprimanded by Burton concerning the Deb Yetter matter.

■ Title VII prohibits an employer from discriminating against an employee in retaliation for opposing unlawful employ-

ment practices or for filing a charge of discrimination. *See* 42 U.S.C. § 2000e–3(a). The three-pronged burden-shifting analysis set forth in *McDonnell Douglas* applies to retaliation claims. In the absence of direct evidence, a prima facie case of retaliation requires a plaintiff to show that (1) he engaged in protected opposition to discrimination; (2) he was subjected to adverse employment action by the employer; and (3) a causal connection exists between the protected activity and the adverse action. *See McCue v. Kansas Dept. of Human Resources*, 165 F.3d 784, 789 (10th Cir.1999). "If a prima facie case is established, the burden of production shifts, and the defendant must articulate a legitimate, nondiscriminatory reason for the adverse action." *Purrington v. University of Utah*, 996 F.2d 1025, 1033 (10th Cir.1993). If the employer offers such a reason, the plaintiff may survive summary judgment by showing that there is a genuine dispute of material fact as to whether the proffered reason for the challenged action is pretextual. *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208 (10th Cir.1997).

Payless argues that the evidence fails to support plaintiff's contention that she was retaliated against in the decision to promote Burton and not her to the position of manager of Finance/Inventory Control/Production Planning. We agree. As noted previously, we find no evidence that the reasons offered by Payless were pretextual for discrimination or retaliation. The evidence fails to show any evidence of retaliation by Payless in making this decision.

Payless argues that it is entitled to summary judgment on plaintiff's claim of retaliation based on the issuance of the letter of reprimand on two grounds. First, Payless contends that plaintiff cannot establish a prima facie case on this claim because she did not suffer an actionable adverse employment action. Payless asserts that the issuance of the letter of reprimand did not affect the terms and conditions of plaintiff's employment. Second, Payless argues that plaintiff has not demonstrated that

the reason for the reprimand was pretextual for retaliation. Payless suggests that the evidence shows that the reprimand was legitimate, non-retaliatory discipline, and far less stringent than could have been taken.

The courts have taken differing views of what constitutes an adverse employment action for the purposes of a retaliation claim under Title VII. The Supreme Court has recently provided the following definition: "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly differing responsibilities, or a decision causing a significant change in benefits." *Burlington Industries v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2268–69, 141 L.Ed.2d 633 (1998).

The Tenth Circuit liberally defines the phrase "adverse employment action." *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir.1998). Such actions are not limited to monetary losses in the form of wages or benefits. *Jeffries v. State of Kansas*, 147 F.3d 1220, 1232 (10th Cir.1998). The Tenth Circuit suggests that each case must be evaluated on "a case-by-case approach." *Id.* In *Jeffries*, the court held that verbal interrogation and reprimand, threats to withdraw supervision and not renew the employee's contract were sufficient to constitute adverse employment actions even though the actions did not actually have an adverse impact on the terms and conditions of the employee's employment. *Id.* at 1232–33. Other examples of adverse employment actions include decisions that have a demonstrable adverse impact on future employment opportunities or performances, *see Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir.1996), demotions, adverse or unjustified evaluations and reports, *id.*; transfer or reassignment of duties, *Sauers v. Salt Lake County*, 1 F.3d 1122, 1127–28 (10th Cir.1993); failure to promote, *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1471 (10th Cir.1992); and unfa-

vorable letters of reference to prospective employers, *Rutherford v. American Bank of Commerce*, 565 F.2d 1162, 1164–65 (10th Cir.1977).

Other circuits have taken a more restrictive approach to this issue. *See Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir.1997) (only adverse employment actions that "rise to the level of an ultimate employment decision [are] intended to be actionable under Title VII."); *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir.) (noting, in the context of a retaliation claim, that "the verbal threat of being fired" and a "reprimand" are not "adverse employment actions" because they "lack ... consequence"), *cert. denied*, —— U.S. ——, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997).

■ Frankly, if we were writing on a clean slate, unencumbered by the precedents established in the Tenth Circuit, we would probably follow the lead established by the Fifth Circuit in *Mattern*. We agree with the interpretation of the statutory language applicable to retaliation cases provided by the *Mattern* court. Nevertheless, given the Tenth Circuit's "liberal" view of the definition of the phrase "adverse employment action" and some of its cases interpreting that phrase, we believe that we must find that the written reprimand here constitutes an adverse employment action.

■ With that decision behind us, we proceed to apply the *McDonnell Douglas* burden shifting analysis. Again, the court shall proceed directly to the issue of pretext since the defendant has sufficiently articulated a legitimate, nondiscriminatory reason for the reprimand.

In evaluating this claim, we note several significant facts. First, plaintiff has failed to dispute the facts relevant to this matter. Second, we note that the investigation that triggered this reprimand was initiated by three female employees that plaintiff supervised.

Plaintiff had originally hired Deb Yetter through a temporary employment agency to work under plaintiff's supervision at defendant's facility. Shortly after Mike Burton assumed the position of manager of Finance/Inventory Control/Production Planning, three female employees approached Burton complaining about favoritism they perceived plaintiff accorded Yetter, and complaining that Yetter was being compensated for time she was not actually working. Burton asked for an investigation of the matter. Upon determining that Yetter's time sheets were inconsistent with her actual arrivals and departures, Burton determined that Yetter was being compensated for time she did not spend working. Burton conferred with plaintiff on the matter and subsequently conferred with managerial staff to determine the proper course of action to be directed toward Yetter and plaintiff. Yetter was released from her employment with Payless, and plaintiff was issued a written reprimand.

Plaintiff contends that Payless reprimanded her for this incident in retaliation for complaining about Robinson's conduct. She contends that other employees who engaged in similar conduct did not receive equivalent discipline.

The uncontroverted facts fail to support plaintiff's claim that the reprimand was in retaliation for filing a charge of discrimination or raising complaints about such discrimination. Plaintiff has failed to come forward with any evidence showing that employees who engaged in similar conduct did not receive the discipline she received. Accordingly, we find that the defendant is also entitled to summary judgment on this claim.

CONSTRUCTIVE DISCHARGE

Plaintiff contends that she was constructively discharged when she left Payless' employment on February 10, 1995. She asserts that she was constructively discharged because Payless subjected her to repeated discriminatory acts, refused to consider her for a promotion to manager of Finance/Inventory Control/Production Planning, and took repeated actions that eliminated her opportunities for advancement and damaged her job security by

giving her a negative annual review and by placing a formal written reprimand in her personnel file that threatened termination without additional counseling.

 To prove a prima facie case of constructive discharge, the plaintiff must demonstrate that the defendant subjected her to working conditions that a reasonable person would view as intolerable while other employees outside the protected group were not similarly treated. *Reynolds*, 69 F.3d at 1534. The plaintiff must further show that a reasonable person would consider the conditions so intolerable as to feel compelled to resign or quit. *Id.; Bolden*, 43 F.3d at 552. The plaintiff's own assessment of the working conditions, standing alone, generally "is insufficient to create a factual question for the jury as to whether a constructive discharge occurred. The test for constructive discharge is an objective one." *Ulrich v. K–Mart Corp.*, 858 F.Supp. 1087, 1093 (D.Kan.1994), *aff'd*, 70 F.3d 1282 (10th Cir. 1995) (Table).

 This is, without question, the weakest of the claims asserted by plaintiff. The court is not persuaded that any of plaintiff's contentions, either singularly or collectively, could have "forced her to quit." Plaintiff's suggestion that the hostile work environment forced her to quit is ludicrous in light of the circumstances that existed at the time of her departure. Robinson, her alleged abuser, had left employment with Payless in December, over two months prior to plaintiff's resignation. Plaintiff admitted that she had no problems with her new supervisor. Her other contentions simply fail as a matter of law. In sum, the court finds that Payless is also entitled to summary judgment on this claim.

## CONCLUSION

As explained in this opinion, the court has granted summary judgment to Payless on all claims made by the plaintiff. In order to reach this conclusion, the court made a thorough review of the record in this case. Factually and legally, plaintiff's claims had serious problems. Nevertheless, due to the quality of her counsel, plaintiff was able to make some credible arguments concerning most of her claims. The court applauds the efforts of both sides in presenting this case.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Doc. # 42) be hereby granted. Judgment shall be entered for the defendant and against the plaintiff on all claims.

**IT IS SO ORDERED.**