# IN THE SUPREME COURT OF TEXAS

No. 16-0244

ALAMO HEIGHTS INDEPENDENT SCHOOL DISTRICT, PETITIONER,

v.

CATHERINE CLARK, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

JUSTICE BOYD, joined by JUSTICE LEHRMANN, dissenting.

Imagine this case:

Catherine, an experienced physical-education teacher, began a new job in a small school district near San Antonio. She was excited to join the junior-high faculty and become part of a very reputable community. When Catherine attended the teacher-orientation meeting, she met Andy, a fellow coach at the junior-high school. Andy seemed nice at first, but throughout the training he repeatedly made remarks to Catherine about the assistant principal's breasts, asking if Catherine thought they were "real." Catherine dismissed the comments, but she "wondered how dangerous it was to have a [] coach like [Andy] around" the locker rooms of the junior-high school.

Catherine soon began hearing rumors that the school's athletic department frequently experienced "turmoil" and that some of the coaches had a "reputation for partying" and engaging in unprofessional "sexual relations." As it turns out, Andy, who was also new to the school that year, fit right in. He was constantly rude and vulgar, always making inappropriate comments both

to and about other coaches, teachers, students, and parents. He used "offensive and derogatory language, threatening and intimidating conduct, offensive jokes," "slurs," and "innuendo." Catherine felt uncomfortable around Andy and thought his behavior was completely inappropriate, especially at a junior-high school. But she did not initially report her concerns because she was not a confrontational person, Andy had told her he was "revengeful" and had "retaliated against others from the workplace in the past," and she had been warned "not to go to" or "cross" the school's principal. Catherine's ability to ignore Andy's conduct quickly deteriorated, however, when he began directing his attention toward her personally.

Andy seemed to have a fascination with Catherine's body, frequently commenting on her intimate body parts in inappropriate and unwanted ways. On one occasion, Andy said to Catherine, "Wow . . . I think your boobs are going to pop out of your shirt!" Another time he remarked, "God, Coach, you are wearing those blue pants again? You know I can see your G-string through them. And I can see the dimple in your ass." Over the next few months, Andy continued to comment on Catherine's breasts "almost every day," and encouraged their co-workers to "name the dimples in [her] ass." Later, Andy informed Catherine that the "guy coaches were betting that [her] breasts were fake," and he insisted to her that they were. Andy saturated the coaches' office with sexual comments and conduct, sending "dirty pictures and off-colored" emails; regularly using profane and sexual language; regularly and openly discussing his "sexual deviance" and promiscuity; sharing explicit photos of male genitalia; and repeatedly suggesting that Catherine and another male coworker "would make a good couple" and should "hook up," despite Catherine's protests that she was married and found the suggestions offensive and humiliating.

Andy's sexual and unprofessional conduct towards Catherine reached a pinnacle around the holidays. Before the staff Christmas party, Andy bought "indecent ornaments" and urged Catherine to take one and give it as a gift at the party. Andy later asked Catherine to give him a "tea bag" to decorate his Christmas tree, and then teased her because she hadn't picked up on a sexual innuendo. When Catherine gave Andy a candle in the gift exchange, Andy thanked Catherine and said, "I'm going to f--k next to it and think about you." At the party, Andy and another coworker began "fooling around," "grab[bed] [the] private areas of their bodies for photographs next to the Christmas tree," and engaged in "horseplay" and "extremely dirty dancing." When the group posed together for a photo near the tree, Andy and the coworker reached around and grabbed Catherine's bottom. Catherine left the party early, "embarrassed," "frustrated," and "worried" about Andy's continued harassment, despite her repeated pleas that he stop.

Catherine returned to work in January, hoping that Andy's inappropriate comments and conduct would cease after the holiday break. Instead, they grew worse. When Catherine politely asked Andy how his break went, he replied: "Awesome. It was a F--k Fest. I boinked the entire time." He then asked Catherine if she "got any" over the holidays. Andy's comments about Catherine's breasts and other intimate body parts continued, often within earshot of the school's young students. On one occasion, while Catherine was serving pizza, Andy told Catherine that she "better step back or [she] would get pizza sauce on [her] enormous tits." On another day, Andy commented on "how tan" Catherine's chest was after a spring-break vacation. Later, Andy remarked to other coaches in the office, "I wonder if Coach [Catherine] swallows." And on still

another day, when Catherine was eating lunch, a student "poked her head in the [athletic] office and exclaimed 'I smell shrimp!,'" to which Andy responded that Catherine should "close her legs."

That spring, Catherine turned to her and Andy's supervisor, the athletic department head, for help. Unfortunately, the department head dismissed Catherine's complaints, and sometimes even joined Andy in the harassing comments and conduct. Finally, in May, Catherine went to the school's principal to report Andy's conduct, but she was so upset that the principal referred her to the school counselor and asked her to submit a written account of her concerns. Catherine complied, submitting a thirteen-page document detailing Andy's conduct. But instead of addressing Catherine's complaints or reporting them to District officials, as the District's sexual-harassment policy required, the principal conducted an informal investigation, issued a written response finding "no evidence supporting the details of [Catherine's] experiences or perceptions," and instructed Catherine to be more proactive about reporting her complaints.

When Catherine returned for the new school year after the summer break, Andy's harassing conduct continued. But now Andy's conduct toward Catherine became more aggressive, to the point of "bullying." Once, Andy told Catherine that he used her razor (which she stored in her locker in the staff bathroom) to shave his genitalia. He repeatedly "bump[ed]" and "block[ed]" Catherine when she attempted to move around the athletic office. Catherine frequently found her personal belongings displaced and her work station disorganized. Catherine became especially disturbed when Andy directed hostile comments toward her five-year-old daughter. At one point, he told Catherine he would "stick a popsicle stick up [the child's] butt" if the child "did not stop annoying" him. On another occasion he threatened to "lock [the child] in the bathroom." As a result of Andy's more aggressive conduct, the friction within the athletic department grew worse,

4

and Catherine continued to report her concerns. In response, the principal called weekly meetings with Catherine, Andy, their department head, and the athletic director.

Soon, the principal began requiring Catherine to attend separate meetings with just the principal and athletic director. These meetings focused on alleged inadequacies in Catherine's conduct. Ultimately, the principal blamed Catherine for the friction, complaining about Catherine's job performance, communication skills, inabilities to get along with others, and bringing her child to work. Because she believed the principal and other District officials did not take her complaints seriously and that they had been "swept under the rug," Catherine filed a complaint with the federal Equal Employment Opportunity Commission (EEOC), complaining that she had been sexually harassed at work and retaliated against for reporting that harassment. Shortly after Catherine filed her EEOC complaint, the principal placed Catherine on a teacher "growth plan" for her alleged failure to communicate, get along with her coworkers, and comply with District policies. The principal also put Andy on a growth plan, but his conduct toward Catherine did not change. As the principal had instructed, Catherine continued to submit complaints, not only about Andy (who, she complained, continued to harass and bully her), but also about their department head and the principal (who, she complained, were retaliating against her for reporting Andy's conduct).

In February of that second school year, Catherine became so ill from the stress of her work environment that her doctor recommended she take several weeks of medical leave. When she returned, however, the principal responded to her most recent complaints by again finding no supporting evidence and blaming Catherine for the problems. Meanwhile, Andy became more aggressive and began pushing Catherine, physically threatening her, and even following her in his

car. After Catherine filed formal grievances about this conduct, the principal finally transferred Andy to another school, as Catherine had requested, and declined to recommend that Andy's contract be renewed for another year. But the District also opened an investigation into Catherine's conduct. Based on findings that Catherine had failed to properly complete some lesson plans, consistently maintain grades, respond truthfully regarding questions about a standardized-testing issue, follow her growth plan, and other alleged conduct, the District terminated Catherine's employment that summer.

Assuming these facts are true, I am confident that a reasonable juror could find that Andy made Catherine's work environment "objectively hostile or abusive." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). And considering "all of the circumstances," a reasonable juror could also find that Andy harassed Catherine "because of" or "based on" her sex, at least during the first several months Catherine worked at the school. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 23). And a reasonable juror could find that the principal and the District retaliated against Catherine because she summoned the courage to complain about Andy's sexual improprieties and harassment.

But could a reasonable juror reach those same conclusions if, as in this case, the harasser was a woman named Annie instead of a man named Andy?[1]

---

[1] The Court incorrectly asserts that this hypothetical "materially alters the facts," "chang[es] the facts," and is "wrong on . . . the record." *Ante* at __ & n.153. Don't be fooled. The one and only fact this hypothetical changes from the record evidence is the fact that the alleged harasser was a woman instead of a man. Whether that change is "material"—in that it negates the permissible inferences a reasonable juror could make based on all the other the facts—is the key legal issue in this case. But to the extent the Court's use of the plural "facts" or its vague reference to "any other factual issues" is intended to suggest that this hypothetical has altered or changed any other facts, the accuser bears the burden of proof. The Court does not and cannot point to a single other fact that the record does not support. And the Court's suggestion that this "retelling" of the events creates a "misleading impression of the record" simply confirms the Court's failure to follow the controlling standard of review. To determine whether the record

6

# I.
## Catherine's Case

The Texas Commission on Human Rights Act (TCHRA) prohibits employers from "discriminat[ing]" against employees "because of" sex. TEX. LAB. CODE § 21.051. The Act also prohibits employers from retaliating against a person who complains about such discrimination. *Id.* § 21.055. Catherine Clark filed this suit against the Alamo Heights Independent School District, alleging that the District violated both of these TCHRA prohibitions. The District filed a plea to the jurisdiction arguing that governmental immunity bars Clark's claims because the District did not discriminate or retaliate against Clark in any manner that violates the TCHRA. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–28 (Tex. 2004). In support of its plea, the District submitted evidence that it took adverse actions against Clark and ultimately fired her not because she complained about harassment, but because she violated District policies, had poor communication skills and difficulty getting along with others, and her job performance fell below the District's expectations. Clark responded by submitting evidence including the facts described above in "Andy's" hypothetical case, except that the coach who repeatedly harassed her was a woman named Annie Monterrubio. The trial court denied the District's plea, finding Clark's evidence sufficient to create a fact issue on both of her claims. The District pursued an

---

contains some evidence to support the plaintiff's claims, we must consider the record "in the light most favorable" to the plaintiff, "indulging every reasonable inference" in her favor, and "resolving any doubts against" the defendant. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). That's what this hypothetical does. It tells the plaintiff's story as she herself would tell it, based on the facts her evidence supports. Although a jury can conclude that her asserted facts are false, we must assume they are true. And although a jury can reject her effort to portray true facts in a light that favors her, we must review the record exactly in that light. In short, we must accept these facts as the facts of this case. The Court negates and ignores them, but facts "are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence." John Adams, *Argument in Defense of the British Soldiers in the Boston Massacre Trials* (December 1770), reprinted in THE TRIAL OF THE BRITISH SOLDIERS 101 (Mnemosyne 1969) (quoted in *Wentworth v. Meyer*, 839 S.W.2d 766, 776 n.1 (Tex. 1992) (Cornyn, J., concurring)).

interlocutory appeal, and the court of appeals unanimously affirmed. *Alamo Heights Indep. Sch. Dist. v. Clark*, — S.W.3d —, 2015 WL 6163252, at *1 (Tex. App.—San Antonio 2015). This Court granted the District's petition for review and now reverses, holding that "no evidence" supports Clark's claims.

I disagree. On the discrimination claim, a reasonable juror could agree with the Court's conclusion that Monterrubio was just a crude and inappropriate person who harassed Clark because Clark was prude, privileged, unnecessarily sensitive, annoying, and "fun" to bully. But a reasonable juror could instead conclude that Monterrubio harassed Clark because of her sex. And on the retaliation claim, a reasonable juror could agree with the Court's conclusion that the District took adverse actions against Clark because her performance was inadequate. But a reasonable juror could instead find that the District took actions against Clark because she complained about the unlawful harassment. So on both claims, the evidence creates a fact issue that a jury—and not this Court—must decide. Ultimately, the jury might not believe Clark's testimony or might conclude that it does not prove her claims, but I agree with the trial court and the unanimous court of appeals that it is at least sufficient to permit a reasonable juror to conclude that it does. Because the Court holds otherwise, I respectfully dissent.

## II.
### Jurisdictional Standard

The TCHRA "clearly and unambiguously waives" governmental immunity, *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 660 (Tex. 2008), but "only for those suits where the plaintiff actually alleges a violation of the TCHRA by pleading facts that state a claim thereunder," *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012). A TCHRA defendant can file a plea to the jurisdiction to assert that the plaintiff has not met her

burden to plead jurisdictional facts, but it can also use the plea to challenge the existence of evidence supporting those facts. *Miranda*, 133 S.W.3d at 226–27. When that occurs, the jurisdictional issue becomes more complicated because it implicates the claim's merits as well as the court's jurisdiction. *Mission Consol.*, 372 S.W.3d at 636–37.

When, as here, "the jurisdictional challenge implicates the merits of the plaintiffs' cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists." *Miranda*, 133 S.W.3d at 227. If the plaintiff pleads facts sufficient to support her claims but the governmental unit disputes those facts, the burden shifts to the governmental unit to present evidence negating the facts alleged. *Mission Consol.*, 372 S.W.3d at 637, 642. If the government's evidence demonstrates that the allegations are not true, the burden shifts back to the plaintiff to offer evidence disputing the government's evidence. *Id.* at 635.

The plaintiff is not required to marshal all her evidence and conclusively prove her claim to satisfy this jurisdictional hurdle. *Id.* at 637. Instead, the trial court's review of the plaintiff's evidence at this stage "generally mirrors that of a summary judgment." *Miranda*, 133 S.W.3d at 228. If the plaintiff's evidence is insufficient to raise a fact issue, the trial court should grant the plea to the jurisdiction and dismiss the case. *Mission Consol.*, 372 S.W.3d at 635. But if the evidence is sufficient to create a fact issue, the court must deny the plea and allow the jury to decide the merits. *Id.*

Here, the trial court found that the evidence creates fact issues and denied the District's plea. The court of appeals unanimously agreed. We now consider the issue de novo. *Miranda*, 133 S.W.3d at 228. We may grant the plea and dismiss the case only if "the law does not allow

9

reasonable jurors to decide otherwise." *City of Keller*, 168 S.W.3d at 823. To determine whether a reasonable juror could find in Clark's favor on either claim, we "must examine the entire record in the light most favorable" to Clark, "indulging every reasonable inference" in her favor and "resolving any doubts against the" District. *Id.* at 824. Accordingly, we must credit evidence that is favorable to Clark "if reasonable jurors could," and disregard any contrary evidence "unless reasonable jurors could not." *Id.* at 827. Ultimately, as the Court itself acknowledges, we cannot dismiss this case if "some evidence"—that is, "more than a scintilla of evidence"—"raises an inference" that supports Clark's claims. *Ante* at __, __, __.

### III.
### Clark's Discrimination Claim

Construing Title VII of the federal Civil Rights Act of 1974, the United States Supreme Court has held that "harassment" constitutes a form of "discrimination" in the workplace. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). Because the TCHRA is modeled after Title VII and designed to support the same objectives,[2] this Court has also recognized that sexual harassment "is a form of sex discrimination prohibited by Title VII and the TCHRA." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010). The Legislature's "enactment of the TCHRA brought our state in line with the federal government in providing a remedy to parties who suffer indignities from workplace sexual harassment." *B.C.*, 512 S.W.3d at 285.

---

[2] *B.C. v. Steak N Shake Operations, Inc.*, 512 S.W.3d 276, 279 (Tex. 2017) (explaining that the TCHRA "is modeled after federal law with the purpose of executing the policies set forth in Title VII of the federal Civil Rights Act of 1964") (quoting *Hoffmann–La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445–46 (Tex. 2004)). Like the TCHRA, Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

Discrimination claims based on sexual harassment generally take one of two forms: (1) quid-pro-quo harassment, in which the harasser demands sexual favors as a condition for granting employment or its benefits, or (2) harassment that creates a hostile or offensive work environment. *See id.* at 279. Clark's claim relies on the hostile-work-environment theory. *See Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) (outlining elements of a hostile-work-environment claim). Under this theory, the plaintiff must establish that the harassment was "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive," and that the plaintiff herself "subjectively perceive[d] the environment to be abusive." *Harris*, 510 U.S. at 21–22. The District argues that the trial court had no jurisdiction over Clark's sex-discrimination claim because the evidence cannot support a finding that (1) the harassment Clark suffered was "severe or persuasive" enough to meet this standard, or (2) Clark suffered the harassment "because of" her sex. The Court agrees with the District's second point and does not address the first.

The word "sex" as used in the TCHRA and Title VII refers to the plaintiff's gender. *See Barber v. Colo. Indep. Sch. Dist.*, 901 S.W.2d 447, 452 (Tex. 1995) (referring to discrimination "because of sex" as addressing "matters of gender discrimination"); *see also Harris*, 510 U.S. at 22 (characterizing Title VII as prohibiting discrimination against employees "because of their race, gender, religion, or national origin"). But the meaning of the phrase "because of" gender is not as clear. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001) (stating that the phrase "because of" is "inherently ambiguous"). The TCHRA and Title VII are not "general civility" codes that "prohibit all verbal or physical harassment in the workplace." *Oncale*, 523 U.S. at 80. A plaintiff must prove not just that the harassment involved words that "have a sexual content

11

or connotations" but also that the harassment occurred "because of" her gender. *Id.* To establish such a claim, the plaintiff may rely on a variety of "evidentiary route[s]," and each claim must be evaluated on a case-by-case basis. *Id.* at 81.

Here, Clark—a woman—alleges that Monterrubio—also a woman—harassed her "because of" Clark's gender. The United States Supreme Court held in *Oncale* that Title VII prohibits same-sex sexual-harassment. *Id.* at 79. Recognizing that the inferences a jury may reasonably draw from evidence of same-sex harassment may differ from those that a jury may draw from evidence of opposite-sex harassment, the Court provided three examples of the types of evidence that may establish that same-sex harassment occurred "because of" the plaintiff's gender: (1) if "there were credible evidence that the harasser was homosexual" or that the harassing conduct was otherwise "motivated by sexual desire"; (2) if the evidence establishes that the harasser was "motivated by general hostility" to people of the plaintiff's gender in the workplace, such as "evidence that a female victim is harassed" in "sex-specific and derogatory terms"; and (3) if "comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace" supports the conclusion that the harasser acted "because of" the plaintiff's gender. *Id.* at 80–81.

The federal courts have consistently agreed that *Oncale*'s three examples "are illustrative, not exhaustive, in nature." *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 455 (5th Cir. 2013) (agreeing with "[e]very circuit to squarely consider the issue"). Many have recognized other forms of same-sex gender-based harassment, such as when the harasser acts based on "sex-stereotyping"—that is, the "plaintiff's perceived failure to conform to traditional gender stereotypes." *Id.* at 453–54, 456 (holding male plaintiff could prove Title VII claim based on evidence that male harasser viewed plaintiff "as insufficiently masculine"). Others have found that

same-sex gender-based harassment occurs when the harassing comments or conduct focus on or are motivated by the plaintiff's gender-specific anatomy and characteristics. *See, e.g.*, *Redd v. N. Y. Div. of Parole*, 678 F.3d 166, 181 (2d Cir. 2012) (holding evidence that female harasser "touched, rubbed up against, and felt those gender-specific, intimate parts of the [female] employee's body" supports claim for discrimination "because of" sex); *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1066 (9th Cir. 2002) (holding evidence that male harasser "targeted body part clearly linked to" male plaintiff's "sexuality" supported claim for discrimination "because of" sex). But "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex.'" *Oncale*, 523 U.S. at 81.

Here, the evidence would permit a reasonable juror to find that Monterrubio harassed Clark "because of" her gender because (1) Monterrubio was "motivated by sexual desire" for Clark, or (2) Monterrubio's harassment of Clark focused on Clark's gender-specific anatomy and characteristics. Although the evidence certainly would not require a juror to reach that finding, it is at least sufficient to permit a reasonable juror to reach it, and the trial court thus properly denied the District's jurisdictional plea.

## A.    Harassment because of "sexual desire"

The most obvious scenario of sexual harassment occurs when a coworker sexually propositions or otherwise engages in direct sexual advances to the plaintiff. *See* 29 C.F.R. § 1604.11(a) ("Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment . . . ."). In *Oncale*, the Supreme Court specifically recognized that evidence that a harasser was "motivated by sexual desire" would

13

be sufficient to establish that the harasser acted "because of" the plaintiff's gender. 523 U.S. at 80. This method does not necessarily require Clark to prove that Monterrubio is a lesbian, but evidence that Monterrubio "might be sexually oriented toward members of the same sex . . . leaves ample room for the inference that" Monterrubio harassed Clark "because" Clark is a woman. *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1010 (7th Cir. 1999). Under this method, Clark may present "evidence suggesting that [Monterrubio] intended to have some kind of sexual contact with [Clark] rather than merely to humiliate [her] for reasons unrelated to sexual interests." *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 479–80 (5th Cir. 2002) (discussing examples of "credible" evidence of "homosexual interest").

Here, the record includes evidence from which a reasonable juror could infer that Monterrubio was motivated by sexual desire, at least during the first several months of Clark's employment. Monterrubio repeatedly called attention to and made comments expressing an interest in Clark's sexual anatomy and sex life. According to Clark, Monterrubio appeared to be "hitting on" her and was "creepy in the way [she] was looking at" her. Clark attributed this conduct to sexual desire, and she became even more concerned when she later heard rumors that Monterrubio was a lesbian and that Monterrubio and their female department head were "sleeping together." Clark stated that she felt so uncomfortable and anxious about Monterrubio's intentions that she "immediately changed . . . direction" when walking toward Monterrubio and tried to teach lessons "without facing" her; frequently "left the office" to avoid Monterrubio's attention, taking her lunch breaks and conference period either in the counseling office or in a workroom in the school's library; regularly "ma[d]e it a point to sit as far away from [Monterrubio] as possible, so that [her] back [was] to the coaches" during faculty and department meetings; "almost always

14

[wore] jackets over [her clothes] as a façade"; and "purposefully prop[ped] files and papers on [her] knees to cover [her] chest at meetings," because she felt so self-conscious about her breasts because of Monterrubio's constant comments.

Further supporting Clark's view of Monterrubio's motives, Monterrubio specifically told Clark that she would "think about" Clark while "f--k[ing] next to" the candle Clark had given her.[3] Later, when Clark was meeting with the department head to complain about Monterrubio's conduct, Monterrubio repeatedly interrupted the meeting and then "stood between [Clark and the department head] and started using her tongue to lick seductively the cupcake icing off of a cupcake." After Clark reacted with disgust to what she perceived as Monterrubio's sexual advances, Monterrubio's harassing conduct got "worse" and turned to "bullying." Although this evidence certainly does not conclusively prove that Monterrubio's harassment was motivated by sexual desire, it is nevertheless some evidence that could reasonably support that finding.

The Court disagrees, not because this evidence would not support the finding but because other evidence appears (to the Court, at least) to contradict it. "Rather than sexual desire," the Court asserts, "the record is replete with evidence that Monterrubio . . . engaged in this behavior for other reasons." *Ante* at __. But in evaluating the District's plea to the jurisdiction, we must consider all of the evidence "in the light most favorable to" Clark, "indulging every reasonable inference" in Clark's favor and "resolving any doubts against" the District's interpretation of the

---

[3] The Court dismisses this fact, finding that "this single comment does not indicate sexual attraction to Clark" because "Monterrubio did not say she wanted to have sex with Clark but with someone else." *Ante* at __. This conclusion dismisses Clark's understanding of the comment and obscures the nuanced ways people experience and express sexual desire. What other reason would Monterrubio have for "thinking about" Clark while having sexual intercourse other than some form of sexual attraction? Surely she would not be reminiscing on her "desire to tease Clark and make her feel uncomfortable" while in the midst of intimacy with someone else. *Ante* at __. Construing this allegation *in a light most favorable to Clark*, as we must, a reasonable person could infer that Monterrubio's comment evidenced sexual attraction to Clark.

15

evidence. *City of Keller*, 168 S.W.3d at 824. And we may grant the District's jurisdictional plea only if no evidence would allow reasonable jurors to conclude otherwise. *Id.* at 823. Applying the proper standard, the fact that a jury could conclude that Monterrubio acted "out of sheer dislike" or because she wanted to "humiliate" Clark does not negate the fact that a jury could instead conclude that Monterrubio was motivated by sexual desire, at least during the first several months of her harassing conduct. *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1265–66 (10th Cir. 2005).

The Court disregards the evidence of sexual desire because, in its view, the "context" of that evidence—that is, other evidence that could support a different motivation—negates any reasonable inference of sexual desire. This approach distorts the applicable standard of review and usurps the jury's role to resolve such factual disputes. The Court is correct that our analysis of a "hostile work environment claim" must necessarily consider "the *environment*" in which the harassing conduct occurred. *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005). As Justice Scalia explained in *Oncale*:

> A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

523 U.S. at 81–82. Accordingly, courts and juries may properly consider "common sense" and "an appropriate sensitivity to social context" in analyzing whether a harasser's conduct is based on gender. *Id.* A coach smacking a football player on the buttocks is unlikely to constitute sexual harassment because the context—"head[ing] onto the field"—informs the conclusion that the coach likely intended only to motivate or congratulate the player. But "the same behavior would

reasonably be experienced as abusive by the coach's secretary (male or female) back at the office" because few (if any) social contexts exist where a coworker would be justified in touching a body part as intimate as one's buttocks in the workplace. *Id.*

Here, Clark's undisputed allegation that Monterrubio "grabbed" her buttocks while posing for a group photo at a work Christmas party clearly falls into the second category. The Court finds that "this isolated instance of intentional physical contact, though understandably upsetting, could not be reasonably interpreted as sexually motivated touching." *Ante* at __. In light of the context— the "environment" in which the touching allegedly occurred—I respectfully disagree.

But the Court's reliance on "context" evidence goes far beyond the "environment" to which Justice Scalia referred in *Oncale*. Relying on our decision in *City of Keller*, the Court asserts that we must disregard the evidence that Monterrubio acted out of sexual desire because, when "all the evidence is reviewed in context," it establishes only that she acted for other reasons. *City of Keller*, 168 S.W.3d at 811. This approach distorts our holding in *City of Keller*, in which we recognized that, in some cases, "the lack of evidence may not appear until all the evidence is reviewed in context." *Id.* As examples, we noted that "publications alleged to be defamatory must be viewed as a whole," that "courts must construe contracts as a whole," that acts "that might constitute outrageous conduct when dealing with a hearing-impaired consumer may be legally insufficient between business parties," and that testimony that is read "out of context" cannot support a verdict. *Id.* at 811–12. Neither our holding in *City of Keller* nor the examples we provided support the Court's view that we may simply disregard evidence that Monterrubio acted (at least on some occasions) out of sexual desire because other evidence suggests that she acted (on other occasions)

17

for other reasons. This is true even though significant evidence conflicting with Clark's position may exist.[4]

To the contrary, as most federal courts have held, evidence that a harasser sometimes harassed the victim because of her gender provides the "context" in which the jury must evaluate harassment that would otherwise appear to be non-gender-based. *See Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001) ("Here, the sex-based character of much of [the harasser's] behavior permits the inference that the remainder of his harassing conduct was also due to [the victim's] sex. And this remains so even though the discriminatory character of some individual incidents might not be evident were they considered in isolation only."); *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999) ("Facially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct."); *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir. 1996) ("Although some of the incidents were gender neutral, i.e., the invasion of plaintiff's desk, the blocking of the doors, the door slamming, the hood slamming, and the spiked drink, the other incidents occurred only because plaintiff was a woman.").

I do not, as the Court accuses, fail to "credit" evidence from which a reasonable juror could infer that Monterrubio harassed Clark for reasons other than her gender. *See ante* at __. I acknowledge that evidence, and reasonable jurors must also consider it, but they could "credit" it

---

[4] *See City of Keller*, 168 S.W.3d at 820–21. ("We have affirmed a bad-faith verdict for legal sufficiency despite 'significant evidence' that the insurer acted in good faith. We have found some evidence of lost profits, even though income tax returns showed the contrary. And we have affirmed a jury's negligence finding despite a defendant's evidence asserting it could not have prevented the accident.") (footnotes omitted).

by placing it within the context of the evidence of the "cherry-picked incidents" and "flashiest examples," *ante* at __, __, that undoubtedly constitute "some evidence" that Clark suffered harassment she simply would not have suffered if she were not a woman. The reasonable jurors that should hear this case might conclude that the former negates the latter or that the latter negates the former, but the Court negates the jury by picking one over the other. Using circular logic, the Court agrees that "gender-based conduct can provide context showing that other facially-neutral conduct is also motivated by gender-based animus," *ante* at __, but it then credits only the facially-neutral conduct to conclude that the gender-based conduct was not gender-based after all.

That is simply not how courts properly evaluate the sufficiency of the evidence when *some* evidence could support either conclusion. As the Tenth Circuit explained in a similar case:

> This case is difficult because, although the harassment at issue was undoubtedly severe and pervasive, only some of it was gender-based. The question then becomes whether Plaintiffs can use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct on summary judgment. Our precedents say that they can . . . . This is because what is important in a hostile environment claim is the *environment,* and gender-neutral harassment makes up an important part of the relevant work environment. Conduct that appears gender-neutral in isolation may in fact be gender-based, but may appear so only when viewed in the context of other gender-based behavior. Thus, when a plaintiff introduces evidence of both gender-based and gender-neutral harassment, and when a jury, viewing the evidence in context, "reasonably could view all of the allegedly harassing conduct . . . as the product of sex and gender hostility," then "*it is for the fact finder to decide whether such an inference should be drawn.*"

*Chavez,* 397 F.3d at 833 (emphasis added) (citing *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1262 (10th Cir. 1998) and quoting *O'Shea,* 185 F.3d at 1097, 1102). By "parsing out the various instances of harassment and characterizing them as gender-neutral," the Court "seeks to eschew the proper 'totality of the circumstances' test, which is the 'touchstone' of our analysis

of hostile work environment claims." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 799 (10th Cir. 2007).

In short, the Court distorts the applicable standard of review. Evidence supporting one fact does not negate evidence supporting a conflicting fact, even if the record contains significantly more of the former than of the latter. *City of Keller*, 168 S.W.3d at 821. The Court concludes that no evidence supports the inference of gender-based conduct because "only a handful" of the "more than one hundred incidents" Clark complained of involved comments "about female body parts, including Clark's buttocks, the size of her breasts, and whether they are real." *Ante* at __. In fact, however, Clark testified that Monterrubio commented about Clark's breasts "almost every day" during their first few months working together. While she did not chronicle and detail all of those comments, she was not required to "marshal" all of her evidence and "prove her claim" to defeat the District's jurisdictional plea. *Mission Consol.*, 372 S.W.3d at 637. Instead, she merely had to provide "more than a scintilla" of supporting evidence to create a fact issue, and when that evidence of

> the context of the harassment *leaves room for the inference* that the sexual overlay was not incidental—that the harasser was genuinely soliciting sex from the plaintiff or was otherwise directing harassment at the plaintiff because of the plaintiff's sex—then the task of deciding whether the harassment amounts to sex discrimination will fall to the finder of fact.

*Shepherd*, 168 F.3d at 1011 (emphasis added).[5]

---

[5] Using similar logic, the Court also suggests that Monterrubio's conduct was merely "sexual horseplay," and not sexual harassment or discrimination. *Ante* at __ n.56 (citing *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 562 (7th Cir. 2016) ("Sexual horseplay differs from sex *discrimination*, and Title VII covers only discriminatory conduct.")). Conduct characterized as "mere sexual horseplay" may indeed be insufficient to support a claim under the TCHRA, but that is because such conduct is not sufficiently "severe or pervasive" to constitute actionable harassment, not because it is not directed at the plaintiff "because of" sex. *See Candelore v. Clark Cty. Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992) (per curiam) ("[T]he isolated incidents of sexual horseplay alleged by

Even when "the evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess." *City of Keller*, 168 S.W.3d at 821. Here, the Court intercepts the jury's responsibility, ignoring evidence that supports a finding of sexual desire because other evidence supports a finding that Monterrubio engaged in the harassing conduct for "other reasons," and failing to consider the reasonable inference that Monterrubio's conduct and motives changed over time as Clark repeatedly responded negatively to Monterrubio's comments and actions. Viewed under the applicable standard of review, I must conclude that the evidence here requires that a jury decide whether Monterrubio harassed Clark out of sexual desire and thus "because of" her gender.

**B.     Focus on gender-specific characteristics**

Harassing conduct "need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale*, 523 U.S. at 80. Rather, the "critical issue" is whether the plaintiff was "exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)). Based on this principle, federal courts have recognized that harassing comments and conduct that focus on the victim's gender-specific anatomy and characteristics constitute discrimination "because of" sex, even in the absence of any evidence of sexual desire. *See, e.g.*, *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010) (holding that

Candelore took place over a period of years and were not so egregious as to render Candelore's work environment 'hostile.'"). The Court does not reach the issue of whether the conduct that Clark's evidence describes was "severe or pervasive." I certainly believe a reasonable jury could conclude it was. If Clark's description of the facts is true, and we must assume it is at this point, the Court's suggestion that Monterrubio's conduct was merely "sexual horseplay" usurps the jury's role to make that determination. I doubt the Court would consider such conduct mere "sexual horseplay" if Monterrubio had been the hypothetical "Andy," and if the evidence establishes anything, it establishes that Cathy certainly did not consider Monterrubio's comments and conduct to be "sexual horseplay." Nor, I believe, would a reasonable juror, even in this same-sex context.

21

"gender-specific, derogatory, and humiliating" words and conduct are "sufficient to afford the inference that the offending conduct was based on the sex of the employee"); *see also Oncale*, 523 U.S. at 80 (noting that "sex-specific and derogatory terms" and conduct may support an inference of discrimination because of sex).

Numerous federal courts have held that harassment "because of sex" includes harassing conduct and comments that focus on "gender-specific, intimate parts" such as a woman's breasts, *Redd*, 678 F.3d at 181; "female body parts," *EEOC v. Fairbrook Med. Clinic*, 609 F.3d 320, 327 (4th Cir. 2010); "women's breasts, nipples, and buttocks," *Reeves*, 594 F.3d at 804, 811–12; and "women's bodies and sexual conduct," *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994). Contrary to the Court's suggestion, these courts have not based their holdings on evidence of harassment that merely includes "sexual content or connotations," *ante* at __, but on harassment that focuses specifically on the victim's gender-specific, intimate, sexual attributes. "A raft of case law . . . establishes that the use of sexually degrading, gender-specific epithets, such as 'slut,' 'c-nt,' 'whore,' and 'bitch,' . . . has been consistently held to constitute harassment based upon sex." *Forrest v. Brinker Int'l Payroll Co., LP*, 511 F.3d 225, 229 (1st Cir. 2007). While general crudeness, sexual jokes and innuendo, and inappropriate conduct may not demonstrate harassment "because of" gender, harassment that focuses specifically on the appearance, size, and smell of a woman's breasts, genitalia, and buttocks does, because that kind of gender-specific harassment simply "would not have occurred if she were not a woman." *Winsor*, 79 F.3d at 1000.[6]

---

[6] Courts have utilized the same approach in male-against-male harassment cases. *See, e.g.*, *Rene*, 305 F.3d at 1066 (noting harasser's focus on "body parts clearly linked to [a man's] sexuality").

Here, Clark's evidence—if true—establishes that a significant amount of Monterrubio's harassing comments and conduct, especially during the first several months, focused specifically on Clark's gender-specific, intimate, sexual anatomy and characteristics. Clark alleged and testified that Monterrubio repeatedly harassed Clark by commenting on the size and appearance of Clark's "breasts," "boobs," and "tits;" that she also harassed her by making rude comments on the visibility of her "G-string," the "dimples in her ass," and even the "smell" of her genitalia; that she teased and belittled Clark's relative sexual naiveté using sex-specific terms (e.g., "tea bag;" "menage a twat"); and that she "grabbed" Clark's buttocks at the Christmas party. If Clark's harasser had been a male—the hypothetical "Andy" described above—this evidence would undoubtedly permit a reasonable juror to conclude that Clark suffered that type of harassment "because" she is a woman.[7] But just as undoubtedly, at least under the federal courts' application of *Oncale*, a jury could also reasonably infer from this evidence that the harassment Clark received from Monterrubio "would not have occurred if she were not a woman," *Winsor*, 79 F.3d at 1000, and thus occurred "because of" Clark's gender.

The Court argues that the evidence of gender-specific comments and conduct in this case is insufficient to establish that Clark suffered harassment "because of" her gender. For example, ignoring all of the evidence of Monterrubio's insulting comments about Clark's female body parts,

---

[7] *See Casiano v. AT&T Corp.*, 213 F.3d 278, 285–86 (5th Cir. 2000) ("Indeed, we need only hypothetically transpose the sexes of the parties in this case to demonstrate our point: If [Harasser] had been male and [Plaintiff] female, summary judgment evidence supporting allegations that the male supervisor had (1) called the female subordinate 'honey' in the presence of other employees; (2) repeatedly demanded that she bring him his coffee, cold drinks, snacks, and a personal item; (3) attempted, in the privacy of his office, to initiate discussions with her about their respective sexual proclivities, preferences, and performances; and (4) in a four-month period, propositioned her (and been rejected) to engage in extramarital sex with him . . . would any court conclude that—if proved—such behavior would not constitute severe or pervasive sexual harassment?").

the Court focuses on Monterrubio's "grabbing" of Clark's buttocks, which the Court refers to as an "isolated instance of intentional physical contact." *Ante* at __. Downplaying the effect of this incident as merely "understandably upsetting," the Court concludes that Monterrubio's "grabbing" of Clark's buttocks "could not be reasonably interpreted as sexually motivated touching," apparently because males also have buttocks and because it occurred at a Christmas party while a photo was being taken. *Ante* at __. Contrary to both our and the U.S. Supreme Court's precedent, the Court's conclusion ignores "all the circumstances" creating the context in which the "contact" allegedly occurred.[8] *See Harris*, 510 U.S. at 23 (explaining that sexual-harassment claims must be judged in light of "all the circumstances"). In all harassment cases, the inquiry "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81. Viewed in the context of Monterrubio's numerous and repeated comments regarding Clark's gender-specific anatomy, sex life, and relative sexual naiveté—all made by a co-worker in a middle-school educational environment—a reasonable juror could conclude that Monterrubio's "grabbing" of Clark's buttocks, as well as her repeated physical "brushing" and "blocking" of Clark around the offices, constituted harassment "because of" Clark's sex.

Similarly, the Court asserts that the evidence of gender-specific harassment is insufficient because Monterrubio's harassing conduct, *as a whole*, was not "focused" on Clark's gender-

---

[8] The Court also disregards aspects of Clark's testimony regarding this event. While it's true that Clark used the words "horseplaying" and "playing" in describing Monterrubio's conduct before the "butt-grabbing" incident, she also stated that she knew Monterrubio "wasn't playing around because that's not the way I play." Clark further described that Monterrubio sneakily "reached around so nobody else would see" when she grabbed Clark. Finally, Clark also stated that she "had already told [Monterrubio and their department head] to stop touching me," and stated that she felt, "upset," "embarrassed," "frustrated," "worried," and "I just felt like getting out of there."

24

specific anatomy, "the record does not support a conclusion that 'the bulk'" of Monterrubio's

harassing comments "relate to the fact that Clark is a female," *ante* at __, and many of the incidents

Clark described "are not remotely sexual in nature," *ante* at __. This argument again distorts the

applicable standard of review. The fact that some of Monterrubio's harassing comments and

conduct were not focused on Clark's gender-specific anatomy does not negate the evidence that

some of them were.

It is well-settled that harassing conduct need not be overtly "sexual in nature" to constitute

conduct "because of" gender.[9] Many types of nonsexual harassing activities can be "because of"

gender: epithets, slurs, or negative stereotyping; threatening, intimidating, or hostile acts; and

written or graphic material that denigrates or shows hostility or aversion toward an individual or

group. *See Reeves*, 594 F.3d at 811–812; *Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*, 261 F.3d

512, 524 (5th Cir. 2001). So the Court is wrong to simply disregard Clark's evidence of actions

that are not overtly "sexual in nature." But more importantly, the Court wrongly rejects

Monterrubio's clearly "sexual" gender-specific harassing comments and conduct simply because

they do not constitute "the bulk" of Monterrubio's harassing behavior. As the First Circuit has

explained, because courts must consider the evidence in light of "all the circumstances," they

> should avoid disaggregating a hostile work environment claim, dividing conduct
> into instances of sexually oriented conduct and instances of [nonsexual] unequal
> treatment, then discounting the latter category of conduct. Such an approach defies
> the [Supreme] Court's directive to consider the totality of circumstances in each
> case and "rob[s] the incidents of their cumulative effect." Moreover, such an
> approach not only ignores the reality that incidents of nonsexual conduct—such as

---

[9] *See, e.g.*, *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008) (holding plaintiff need not prove she was subjected to sexual advances to prove hostile environment; it is sufficient to prove that she was subjected to hostility because of her gender); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007) (holding offending conduct may rise to level of actionable harassment even if it is "sexist" as opposed to sexual in nature); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (holding offending conduct need not be sexual in nature to constitute unlawful sexual harassment).

> work sabotage, exclusion, denial of support, and humiliation—can in context contribute to a hostile work environment, it also nullifies the harassing nature of that conduct.

*O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001) (quoting *Williams*, 187 F.3d at 561). Courts, in other words, should not attempt to separate and weigh evidence of "sexual" harassment against evidence of "nonsexual" harassment when determining whether the harassment creates a hostile work environment. Nor should they do so when deciding whether the record could support a finding that the harassment, or at least some of it, was "because of sex."

Regardless of the evidence in this case, the Court simply rejects the notion that harassment focused on the victim's gender-specific characteristics can constitute harassment "because of sex," at least in same-sex-harassment cases. According to the Court, "the bare act of one woman speaking to another woman about her female anatomy does not establish the comments were gender motivated." *Ante* at __. But of course it does, if the first woman is speaking to the second woman about the *second* woman's female anatomy. That does not mean the statements are inappropriate or constitute harassment, of course, but the first woman could have no motivation to speak to a man about his "female anatomy." The first woman can comment about the second woman's female anatomy only *because* she is a woman.

Nevertheless, the Court asserts that "a standard that considers only the sex-specific nature of harassing conduct without regard to motivation is clearly wrong in same-sex cases." *Ante* at __. As many federal courts have observed, however, harassment that focuses on a woman's unique sexual features, which could "not have occurred if she were not a woman," constitutes harassment "because of" her gender even if "the motivation behind plaintiff's mistreatment was gender neutral." *Winsor*, 79 F.3d at 1000. While the Court asserts that "[w]hy matters," *ante* at __, the

26

federal courts have concluded that the "fact that [such] abuse was motivated by gender neutral reasons is irrelevant." *Id.* at 1001. When the victim is subjected to harassment focused on her gender-specific anatomy and characteristics, the harassment occurs "because of" her gender regardless of the harasser's underlying motivation. The issue is *whether* the defendant harassed the plaintiff "because of" her gender, not *why* the defendant harassed the plaintiff "because of" her gender. "Whether a harasser picks his or her targets because of a prior intimate relationship, desire for a future intimate relationship, or any other factor that draws the harasser's attention should not be the focus of the Title VII analysis." *Forrest*, 511 F.3d at 229. "Instead, improper gender bias can be inferred from conduct; if the harassing conduct is gender-based, Title VII's requirement that the harassment be 'based upon sex' is satisfied." *Id.*

For this reason, I disagree with the Court's suggestion that the evidence here is insufficient because it merely establishes that Monterrubio was motivated to harass Clark because of personal animus or a personality conflict. *Ante* at __. General harassment motivated solely by personal animosity may not constitute harassment "because of" sex,[10] but harassment that degrades and humiliates a woman by focusing on her gender-specific characteristics does, regardless of the harasser's motives. "There is no excuse in any work environment for subjecting a female worker to such verbal abuse even if the harasser and the plaintiff did not like each other, especially when

---

[10] *See, e.g., Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 666 (7th Cir. 2005) (holding that plaintiff did not establish that the alleged harassing conduct "reflected more than personal animosity or juvenile behavior"); *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1069 (8th Cir. 2005) (holding that female co-worker's conduct—grabbing plaintiff's face and attempting to kiss her on mouth and cheek, attempting to hold plaintiff's hand, pointing to her own buttocks and telling plaintiff to "kiss it," and saying that she didn't have a husband and that she wanted plaintiff— failed to demonstrate that sexual desire motivated co-worker's behavior where co-worker had "generally antagonistic relationship" with plaintiff that "preceded any allegedly harassing conduct"); *Rizzo v. Sheahan*, 266 F.3d 705, 712–13 (7th Cir. 2001) (holding that offensive comments from supervisor expressing sexual interest in plaintiff's daughter were engendered by personal animosity toward plaintiff's husband).

27

this dislike results in a steady stream of sexual harassment." *Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 965 (8th Cir. 1993). Although the evidence here could certainly support a finding that Monterrubio ultimately acted out of animosity toward Clark, that evidence does not negate the evidence that much of Monterrubio's harassing conduct focused on Clark's gender-specific anatomy and characteristics, and thus constituted harassment that Clark would not have experienced but-for the fact that she is a woman.

Similarly, the Court makes much of the evidence that Monterrubio "enjoyed being crass and profane and telling dirty jokes and stories to *all* the coaches, male and female." *Ante* at __. The federal courts, however, have rejected the Court's overly simplistic suggestion that harassment cannot be gender-based if the harasser also victimizes people of the opposite gender. "[A] member of a protected group cannot be forced to endure pervasive, derogatory conduct and references that are gender-specific in the workplace, just because the workplace may be otherwise rife with generally indiscriminate vulgar conduct." *Reeves*, 594 F.3d at 810; *see also Thomas v. Town of Hammonton*, 351 F.3d 108, 117–18 (3d Cir. 2003) (holding that although both male and female employees were subjected to harassing conduct, the conduct supported a finding of gender-based harassment because it contained comments especially disparaging to women and could be intimidating to female employees in a way not experienced by male employees); *Ochletree v. Scollon Prods., Inc.*, 335 F.3d 325, 332–33 (4th Cir. 2003) (holding that even though men were also offended by daily stream of sexual and sexist antics, jury could reasonably find that female plaintiff was individual target of harassment); *Steiner*, 25 F.3d at 1463 (holding that although supervisor abused both men and women, the abuse of women was different because it "relied on sexual epithets, offensive, explicit references to women's bodies and sexual conduct"). On this

record, a reasonable juror could easily conclude that the crude jokes and teasing Monterrubio directed toward male employees and even other female employees was nothing like the personalized, overtly sexual harassment she directed at Clark. Even the Court acknowledges that "Monterrubio may have directed more of her attention to Clark than other individuals." *Ante* at __. And even if the evidence established that Monterrubio "used sexual epithets equal in intensity and in an equally degrading manner against male employees," she "cannot thereby cure" her conduct towards Clark. *Steiner*, 25 F.3d at 1464 (internal quotations omitted). Instead, it might simply mean "that *both* men and women" who worked with Monterrubio "have viable claims . . . for sexual harassment." *Id.*

Finally, the Court raises an absurd absurd-consequences argument, asserting that if same-sex harassment focused on the victim's gender-specific anatomy can constitute harassment "because of sex," then "a female employee could not discuss breastfeeding struggles with a co-worker," and "[w]orkplace breast cancer awareness campaigns would likely end." *Ante* at __. Of course, the Court's concerns are unfounded because the TCHRA does not impose "strict liability" for gender-specific comments; it only prohibits "uninvited" or "unwelcome" *harassment* "because of sex." *Woods v. Delta Beverage Grp., Inc.*, 274 F.3d 295, 298 (5th Cir. 2001); *Harvill*, 433 F.3d at 434. Harassing comments and conduct focused on the victim's gender-specific anatomy can constitute harassment "because of" sex, but that does not mean that every comment focused on gender-specific anatomy constitutes harassment.

Based on the evidence in this record, a reasonable juror could find that Clark simply would not have experienced the harassment she alleges without her female-specific characteristics, and thus her female gender. And a reasonable juror could easily conclude that the conduct and

29

comments about which she testified would cause pain, humiliation, and discomfort rooted in the reality that her mistreatment was inextricably linked to her gender and female sexuality. Monterrubio's conduct towards Clark, if true, simply "is not a manner in which women 'routinely interact;' and it is not conduct that is normal for the workplace." *Redd*, 678 F.3d at 179 (quoting *Oncale*, 523 U.S. at 81).

In short, if Monterrubio was jealous of Clark or had animosity towards her, or if she was simply a crude and mean person who enjoyed teasing and insulting others, she could have chosen many ways to harass Clark. But at least some evidence establishes that Monterrubio's efforts to humiliate Clark were effective because she followed a well-beaten path: she relied on the all-too-common tactics that have historically been used to degrade and deter women in the workplace. Because a reasonable juror could conclude from this evidence that Clark suffered harassment because of sexual desire or because of her gender-specific anatomy and characteristics, I would hold that the evidence is sufficient to create a fact issue on whether Clark suffered discrimination "because of sex" under the TCHRA.

## IV.
## Clark's Retaliation Claim

In addition to prohibiting discrimination, the TCHRA makes it an unlawful employment practice to "retaliate" against a person who complains about such discrimination. TEX. LAB. CODE § 21.055. Title VII also contains an anti-retaliation provision. *See* 42 U.S.C. § 2000e-3 ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."). Accordingly, we look for guidance

30

from the U.S. Supreme Court and other federal courts in analyzing Clark's retaliation claim. *See B.C.*, 512 S.W.3d at 279 ("Texas courts look to analogous federal law in applying the state Act.") (quoting *Waffle House*, 313 S.W.3d at 804).

In this Court, Clark's retaliation claim presents two separate issues. First, we must clarify what Clark's evidence must establish to obtain the TCHRA's waiver of immunity and thus the trial court's jurisdiction. On this issue, I agree with the Court's holding that all three steps of the *McDonnell Douglas* evidentiary framework apply to the jurisdictional inquiry. *Ante* at __.[11] Thus, to avoid dismissal for lack of jurisdiction, Clark had to establish not only her prima-facie case of retaliation, but also that the District's alleged non-discriminatory reasons constituted a pretext for discrimination. *See Miranda*, 133 S.W.3d at 228. In concluding that she failed to meet that burden, the Court first concludes that the TCHRA does not protect some of Clark's activities in response to Monterrubio's harassment, and then concludes that no evidence could support the finding that the District took adverse actions "because of" the actions the TCHRA does protect. I disagree on both points.

---

[11] Under *McDonnell Douglas*, a plaintiff who relies on indirect or circumstantial evidence from which the jury must infer the defendant's motives must first establish with that evidence that the defendant treated the plaintiff adversely because the plaintiff engaged in a protected activity. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 585 (Tex. 2017); *Mission Consol.*, 372 S.W.3d at 634. If the plaintiff meets that burden, the defendant must then articulate a "legitimate, nondiscriminatory reason" for its actions; and if the defendant meets that burden, the plaintiff must establish that the employer's articulated reason is a "pretext" to mask unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 802–04. The presumptions that arise when a plaintiff establishes a prima-facie case under the first step no longer apply if the defendant presents evidence of a non-discriminatory reason under the second step. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) ("[T]he presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production . . . .") (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 506, 511 (1993)). In that case, the plaintiff can only establish a prima-facie case by showing that the defendant's non-discriminatory reasons are a pretext under the third step. Accordingly, I agree with the Court that all three steps of the *McDonnell Douglas* analysis apply to the determination of whether the plaintiff has established a prima-facie case sufficient to fall within the TCHRA's immunity waiver. *Ante* at __.

31

## A.    Protected activities

The Court first concludes that none of Clark's "internal complaints" about Monterrubio's harassment "constitute protected activity under the TCHRA," so her only TCHRA-protected activity was the formal charge she sent to the EEOC in October 2008. *Ante* at __. I respectfully disagree. The record includes evidence that in May 2008 (near the end of her first year with the District) Clark went to the school principal, Stephanie Kershner, in such emotional distress that she was unable to effectively communicate the details of her complaint. Kershner took Clark to the counseling office and directed her to write down the details of her complaint so that Kershner could investigate it. As requested, Clark later submitted a thirteen-page written report detailing her harassment complaints.[12] Clark expressly complained in the letter that Monterrubio:

- "continues to use offensive and derogatory language, threatening and intimidating conduct, offensive jokes, name calling, insults, slurs, and rumors about [Clark]";
- stated "Wow, Coach Clark, I think your boobs are going to pop out of your shirt";
- stated "God, Coach, you are wearing those blue pants again? You know I can see your G-string through them. And I can see the dimple in your ass";
- "continued to talk about [Clark's] bottom and [her] breasts";
- "informed [Clark] that the guy coaches were betting that [Clark's] breasts were fake" and "insisted to me that they were";
- "purchased an indecent ornament for [Clark]," and grabbed her "private areas" in front of Clark;

---

[12] As the Court notes, the record includes two versions of Clark's May 2008 letter—one bearing Clark's signature, which she submitted to Kershner, and another version that Clark attached to her EEOC charge. *Ante* at __ n.121. While the two versions differ slightly in substance, those differences are immaterial to the overall analysis. Specifically, the version Clark submitted to Kershner does not include a paragraph describing Monterrubio's comments during new-teacher orientation, does not include a paragraph describing Monterrubio as desiring to "tease and humiliate" Clark, does not describe an incident where Monterrubio repeatedly encouraged Clark to "hook up" with another teacher, and does not describe an incident where Monterrubio remarked that Clark had a "tan chest" after spring break. Importantly, however, the letter Clark submitted to Kershner does include her complaint that, after Clark gave her a candle at the gift exchange, Monterrubio "made a remark indicating she was going to make love next to the candle when it was lit up in her apartment." Thus, the Court should consider this statement, as well as the myriad others included in her initial letter, as evidence that Clark alerted Kershner that she reasonably believed she was reporting sexual harassment.

- "asked [Clark] for items to decorate [Monterrubio's] own tree, like a teabag . . . using the items in a perverted way" to create "a Christmas tree adorned with items signifying her sexual deviance" and "showed [Clark] a photo of the tree";
- "When receiving a candle that [Clark] gave to [Monterrubio], [Monterrubio] made a remark indicating she was going to make love next to the candle when it was lit up in her apartment";
- stated to Clark that Monterrubio's Christmas break was "Awesome. It was a F--ck Fest. I boinked the entire time";
- watched Clark open boxes of pizza and remarked that Clark "better step back or [Clark] would get pizza sauce on [Clark's] enormous tits";
- "received a photograph on [Monterrubio's] cell phone during a PE class" and showed Clark "the picture of her boyfriend's private area. He had taken and sent her a photograph of his genitals, which he manipulated into a heart shape";
- "gloat[ed] aloud to all the coaches about having three nights in a row with three different men," telling Clark "Don't act so naïve, 'S' stands for slut"; and
- remarked that Clark should "[close] her legs" in response to a student saying, "I smell shrimp!"

The Court concludes that "this letter was not sufficiently specific to put Kershner on notice that Clark was complaining of harassment based on her gender." *Ante* at __. I do not understand how the Court reaches this conclusion. The Court correctly notes that Clark's letter contained many complaints of conduct that were not sexual in nature and not covered by the District's sexual-harassment policy, such as complaints about Monterrubio's teaching ability, unprofessional treatment of students and parents, and remarks about controversial topics such as atheism and abortion in the workplace. The fact that some of Clark's complaints did not implicate actionable conduct, however, does not negate her numerous complaints of sexually inappropriate and gender-specific conduct in violation of the District's sexual harassment policy and the TCHRA. In conclusion, the letter stated, "Not only do [Monterrubio's] actions unreasonably interfere with my work performance, but they are so severe, persistent, and pervasive they create an intimidating, hostile, and offensive working environment in which I refuse to be subjected to anymore." A reasonable person could conclude that Clark's letter contained a report of sexual harassment. And

33

any properly trained school administrator, which Kershner surely was, could reasonably conclude that a report containing these allegations—including specific quotes from the District's sexual-harassment policy[13]—constituted a report of sexual harassment. In fact, Kershner agreed in her testimony that Clark's allegations against Monterrubio (including the inappropriate emails she attached to her letter), if true, would violate the District's sexual-harassment policy.

The Court goes on to state that even if the letter contained some indication of sexual harassment, "a jury could not reasonably conclude Clark alerted Principal Kershner that she thought Monterrubio was acting out of sexual desire towards her or that her conduct otherwise constituted sex-based discrimination." *Ante* at __. But an employee's complaint about a discriminatory practice is a protected activity irrespective of the merits of the underlying discrimination claim. *See San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015);

---

[13] Specifically, Clark stated:

- "[Monterrubio] exposes us all to a type of behavior that is not only inappropriate, but illegal."
- "I have been forced to work in a hostile work environment . . . to the extent that I am unable to perform the duties expected of me at the Junior School."
- "Ann continues to use offensive and derogatory language, threatening and intimidating conduct, offensive jokes, name calling, insults, slurs, and rumors about me."

As relevant to Clark's claim, the District's sexual-harassment policy states: "The District prohibits discrimination, including harassment, against any employee on the basis of . . . gender . . . ." The policy goes on to define "[p]rohibted harassment" as "physical, verbal, or nonverbal conduct based on an employee's . . . gender . . . when the conduct is so severe, persistent, or pervasive the that conduct:

1. Has the purpose or effect of unreasonably interfering with the employee's work performance;
2. Creates an intimidating, threatening, hostile, or offensive work environment; or
3. Otherwise adversely affects the employee's performance, environment, or employment opportunities."

Examples of prohibited harassment include "offensive or derogatory language directed at another person's . . . gender identity; . . . threatening or intimidating conduct; offensive jokes, name calling, slurs, or rumors; [and] physical aggression or assault . . . ." The policy further defines "Sexual Harassment" as "unwelcome sexual advances; requests for sexual favors; sexually motivated physical, verbal, or nonverbal conduct; or other conduct or communication of a sexual nature" when "[s]ubmission to the conduct is either implicitly or explicitly a condition of an employee's employment" or the conduct "is so severe, persistent, or pervasive that it has the purpose or effect of unreasonably interfering with the employee's work performance or creates an intimidating, threatening, hostile, or offensive work environment."

34

*City of Waco v. Lopez*, 259 S.W.3d 147, 151 (Tex. 2008). To establish that an employee opposed a discriminatory practice, the employee "need only show that she had a 'reasonable belief that the employer was engaged in unlawful employment practices.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (quoting *Byers v. Dall. Morning News*, 209 F.3d 419, 428 (5th Cir. 2000)). Thus, the inquiry is whether Clark showed that a jury could reasonably conclude that Clark's letter alerted Kershner *that Clark reasonably believed* Monterrubio's conduct constituted sex-based discrimination. For all of the reasons recited above and in Part III of this opinion, I would find that Clark satisfied this requirement. Accordingly, I would find that Clark engaged in at least two TCHRA-protected activities: her May 2008 letter to Principal Kershner, and her October 2008 EEOC Complaint.

**B.     Causation**

The evidence undoubtedly supports a finding that the District took adverse employment actions against Clark by placing her on a growth plan and then later terminating her employment. But the Court concludes that the record contains no evidence on which a reasonable juror could conclude that the District took those actions because of Clark's complaints. *Ante* at __. As a preliminary matter, without analysis and relying only on Title VII cases, the Court applies the "but-for" standard of causation as articulated by the U.S. Supreme Court in *Burdine* and more recently in *Nassar*. *Ante* at __ n.141 (citing *Burdine*, 450 U.S. at 252–53; *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)). Despite the fact that we "have yet to determine the appropriate causation standard in a TCHRA retaliation claim," the Court proceeds in this manner "because the parties have litigated the case under the but-for standard." *Ante* at __. Although the U.S. Supreme Court—applying the federal Age Discrimination Act and Title VII—adopted the but-for causation

35

standard, this Court—applying the TCHRA—previously adopted the less-restrictive motivating-factor standard in *Quantum Chemical*, which involved a claim of age discrimination under the TCHRA. 47 S.W.3d at 474. There, we held that under the plain text of the TCHRA, "a plaintiff establishes an unlawful employment practice by showing that discrimination was 'a motivating factor' for the practice." *Id.* Because of the significant differences between the language and structure of the TCHRA and Title VII, I would hold that the proper causation standard for a retaliation claim under the TCHRA is the motivating-factor test, at least at the summary-judgment or plea-to-the-jurisdiction stage.[14]

Even applying the but-for causation standard, the record contains ample evidence that the District took adverse employment actions against Clark because of her protected activities. The Court states that Clark's evidence of temporal proximity between her protected activities and the adverse actions fails to satisfy this element because "uncontradicted evidence establishes Kershner and a human resources representative made the decision to implement the growth plan before Clark filed" her EEOC complaint. *Ante* at __. The Court reaches this conclusion, however, only because it refuses to consider Clark's May 2008 letter as a protected activity. Considering that letter, as I

---

[14] In the TCHRA, both the section that prohibits status-based discrimination and the section that prohibits retaliation for protected activities appear in the same subchapter, entitled "Unlawful Employment Practices." TEX. LAB. CODE §§ 21.051, .055. The subchapter on "Application" expressly provides:

> Except as otherwise provided by this chapter, an unlawful employment practice is established when the complainant demonstrates that . . . sex . . . *was a motivating factor for an employment practice, even if other factors also motivated the practice*, unless . . . sex . . . is combined with objective job-related factors to attain diversity in the employer's work force.

*Id.* § 21.125(a) (emphasis added). And the section that prohibits retaliation expressly includes retaliation under "unlawful employment actions." *See id.* § 21.055. The statute's plain text applies the "motivating factor" standard to all "unlawful employment actions" unless otherwise provided. Unlike Title VII, nothing indicates that retaliation cases are different. *See Quantum Chem.*, 47 S.W.3d at 479 ("There are no relevant textual restrictions on the applicability of this section [21.125(a)] to unlawful employment practices.").

36

believe we must, a reasonable juror could find that Clark would not have been placed on a "Teacher in Need of Assistance" growth plan if she had not submitted her letter reporting Monterrubio's sexual and gender-based harassment.

Clark was a physical education teacher for the District from the summer of 2007 until her termination in July 2009. Clark had been a teacher for over ten years prior to joining the District's staff, and all the evidence suggests that Clark had an excellent reputation as an educator and co-worker. The uncontroverted evidence establishes that Clark continued to receive excellent reviews until she started complaining about the alleged harassment in March 2008. Once she started to complain about the harassment, her supervisor and her principal started to identify ways in which her own performance fell short, and the more complaints she made, the more inadequacies they identified.

Under the District's sexual-harassment policy, Kershner was required to submit Clark's complaint to the District's EEOC coordinator, who then had an obligation to investigate (or assign an administrator to investigate) Clark's complaint.[15] Kershner testified that she hoped the conflict between Clark and Monterrubio would die down over the summer break, but it did not. When the teachers returned to campus in the fall, Clark again allegedly suffered harassment from Monterrubio, and continued to report these events to her department head, to the guidance counselor, and to Kershner. Clark was placed on a growth plan in October 2008. The uncontroverted evidence establishes that the District's stated reasons for placing Clark on the

---

[15] Under the District's harassment policy, "Any District supervisor who receives a report of prohibited conduct shall immediately notify the appropriate District official . . . and take any other steps required by this policy." Appropriate District officials are "the Title IX coordinator, the ADA/Section 504 coordinator, and the Superintendent." Specifically, "[r]eports of discrimination based on sex, including sexual harassment, may be directed to the Title IX coordinator." At all times relevant to this appeal, the District designated the Director of Personnel/Public Information as its Title IX coordinator.

growth plan were (1) "failing to communicate" with her co-workers and supervisors, and (2) failing to adhere to the District's grievance policies. In other words, but-for Clark's failure to communicate with her co-workers—specifically Monterrubio and their department head—and failure to adhere to the District's grievance policies, she would not have been placed on a growth plan. Yet the District's human resources director and EEOC coordinator testified that, if evidence existed that Monterrubio and their department head were harassing Clark, it would be unjustified to discipline her for failing to communicate with her coworkers. The human resources director similarly testified that if Clark alleged that her department head did not take her report of harassment seriously or adequately investigate the complaint, it would be unjustified to discipline her for failing to communicate with her supervisor and follow the District's grievance policies. This is sufficient evidence that the District's stated reasons for placing Clark on a growth plan were "pretextual."

Finally, no one disputes that a grievance arising out of a violation of the District's sexual-harassment policy is not subject to the District's ordinary policy and procedures for submitting a non-discriminatory grievance claim. Both Kershner and the human resources director conceded that Clark complied with the District's sexual-harassment policy when she reported her concerns to the principal, Kershner. Kershner and other District officials, however, failed to follow the District's policy. Clark made her initial report of sexual harassment in May 2008 and filed her EEOC complaint in October 2008, but Kershner—who was never designated as an administrator authorized to investigate a sexual-harassment complaint, per the District's policy—did not engage in any authorized investigations until the spring of 2009. This evidence is significant not only because it is evidence of the close timing and retaliatory nature of the District's actions, but also

38

because this Court has held that an employer's failure to adhere to relevant established company policies is probative in a retaliation suit. *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 (Tex. 2000).

Of course, the jury may not believe any of this evidence, may draw different inferences from it, or may completely discount its relevance for one reason or another. Like the Court, I am particularly sympathetic to the difficulties Kershner faced in dealing with Monterrubio's alleged conduct and Clark's reactions to that conduct. Considering the evidence of Clark's own performance failures and the difficulties Kershner faced in maintaining a productive educational setting in the midst of all the conflict, I too might conclude that the District took adverse actions against Clark solely for non-retaliatory reasons. But because the record contains evidence to the contrary, a jury must decide that issue, not the Court. Regardless of whether we apply the motivating-factor test or the but-for test for causation, the record includes evidence from which a reasonable juror could conclude that the District placed Clark on a growth plan and later terminated her employment because of Clark's complaints about Monterrubio's sexual harassment. As a result, the evidence establishes a fact issue regarding the causal link between Clark's protected activity and the adverse employment actions.

### V.
### Conclusion

As this Court observed in *City of Keller*,

> judges and lawyers often disagree about legal sufficiency in particular cases, [but] the disagreements are almost always about what evidence jurors can or must credit and what inferences they can or must make. It is inevitable in human affairs that reasonable people sometimes disagree; thus, it is also inevitable that they will sometimes disagree about what reasonable people can disagree about.

39

*City of Keller*, 168 S.W.3d at 827–28 (footnotes omitted). Despite this truism, "[i]f the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id.* at 822. I would hold that Clark met her burden of producing evidence on each element of her discrimination and retaliation claims under the TCHRA. Whether she can ultimately prevail on those claims is a question for the jury. But because Clark's evidence creates a fact issue on each of the necessary elements, the TCHRA's waiver of immunity applies to Clark's case, and sovereign immunity does not bar the trial court's jurisdiction over her claims. Accordingly, I would affirm the decisions of the trial court and the court of appeals. Because the Court holds otherwise, I respectfully dissent.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: April 6, 2018

40